**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 9 2001**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

VICKIE R. MEDLEY,

      Plaintiff-Appellee,

v.

POLK COMPANY, a Delaware
corporation,

      Defendant-Appellant.

No. 00-1199

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 98-Z-608)**

---

Robert C. Ozer, Esq., of Ozer & Ozer, P.C., Colorado Springs, Colorado, for Plaintiff-
Appellee.

Alan Epstein, Esq. (Steven M. Gutierrez, Esq., with him on the brief), of Hall & Evans,
L.L.C., Denver, Colorado, for Defendant-Appellant.

---

Before **EBEL**, Circuit Judge, **McWILLIAMS**, Senior Circuit Judge, and **OWEN**,
District Judge.[*]

---

    [*] The Honorable Richard Owen, United States District Judge for the Southern
District of New York, sitting by designation.

**OWEN**, District Judge.

_____

In 1999, plaintiff, Vickie R. Medley, had, for two years, been an at-will employee of defendant Polk Company in Denver, Colorado as an assistant to Sheri Paul. When she came to work on the morning of October 2, 1997, there was a phone message from her mother in Nebraska that her father had had a heart attack. Medley informed Paul and said that she was immediately leaving the office to drive to Nebraska, which she did the next day. Some two and a half weeks later, under a set of facts, many of which were undisputed, Polk, acknowledging that her father had had a heart attack and surgery on October 7, concluded that thereafter Medley had, as a practical matter, abandoned her job and discharged her on that ground. Medley brought suit alleging that her termination was a violation of her rights under the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* (hereafter "FMLA"). That Act provides for up to 12 weeks leave for an employee who is needed to "care for...[a] parent [who] has a serious health condition[,]" § 2612(a)(1)(C), coupled with the obligation on the employee to get from the parent's doctor a certification of the need. Medley, aware of this, took no steps to obtain the required certification. (*See infra*).

On the trial, the Polk Company, on the basis of the way Medley dealt with it, or more importantly *had failed to deal with it*, during the crucial two week period October 2-16, sought a jury charge in substance as follows:

An employer who honestly believes that it is discharging an employee for misusing FMLA is not liable even if the employer is mistaken.

The district judge below declined to give the charge,[1] although stating that Polk could argue that position to the jury in summation, and after charging the standard for an FMLA violation:

[Y]ou must find ... :

---

[1]In this regard, Medley's counsel ill-served the district judge during the charge conference by twice misstating the facts of the case:

> This is a case where the employer refused to give FMLA leave under the circumstances in which the HR representative testified she believed that she qualified for it but nonetheless they refused to give it to her and then terminated her because she was without leave.

> * * *

> Well, yeah, they had a good faith belief she was on non-leave status because they didn't grant the leave, not because she did something while she was on leave.

(Aplt. App., Tr. at 419-420.) Medley in fact had testified on the trial that she knew that as soon as practical, a request for FMLA leave must be supported by:

> documentation from my father's doctor saying that I was needed - that his medical care was to the point that he needed someone to be there with him and that my mother's condition was not stable enough to do this care by herself. [*See* 29 U.S.C. § 2613, at 8 *infra*].

(Aplt. App., Tr. at 102-103.) But Medley never undertook to apply for FMLA leave, let alone Polk never refused to give it to her, as her lawyer had told the district judge. She wanted "personal leave" immediately on her return from Nebraska, and so stated in her extensive voice-mail to Paul several days after her return. *See* 9-10, *infra*.

3

> (1) Plaintiff availed herself of a protected right under FMLA;
> (2) Plaintiff was terminated from her employment by defendant, and
> (3) There is a causal connection between the two actions[;]

the district judge then went on to charge:

> In considering the third element, causal connection, you should consider whether defendant would have made the decision to terminate plaintiff regardless of her request and/or taking of leave to which FMLA protections apply. Plaintiff is not required to prove that her request and/or taking of leave to which FMLA protections apply was the sole motivation or the primary motivation but only that it played a role in defendant's decision to discharge plaintiff. Therefore, only if you find that defendant has shown that plaintiff would have been discharged for job abandonment[2] regardless of her requesting and/or taking leave to which the FMLA protections apply should your verdict be for defendant.

(Aplt. App., Tr. at 471-72, 473.) The jury found in favor of Medley, awarding $75,000 in damages which the district court doubled under 29 U.S.C. § 2617(a)(1)(A)(iii) less a small adjustment, together with counsel fees in the amount of $78,401 and $45,000 in "front" money in lieu of reinstatement, the total award being $273,194.

Polk appeals, the main issue being whether it was entitled to what we, dealing with this in this Circuit as a matter of first impression, characterize as the "Honest Belief Defense Charge." There is no question that there is undisputed evidence in the record

---

[2]Footnote by the court: Implicit in the language of this charge as the Court below gave it is the requirement that the defendant show the "job abandonment," which was its reason for the discharge, in fact occurred, or alternatively phrased, that plaintiff had *in fact* abandoned her job, regardless of "requesting" or "taking" FMLA leave. (*See infra*, at 12).

4

which, if credited by the jury, would have supported a jury finding in Polk's favor under the charge it unsuccessfully sought. These facts, the bulk of which are not in dispute, come in major part from the testimony of Medley herself and are as follows:

On the morning of October 2, 1997, Medley received a voice-mail message from her mother that her father had had a heart attack and immediately told her supervisor, Sheri Paul, that she was driving to Nebraska, and left Polk's offices within an hour. *No one at Polk questioned the propriety or necessity of her leaving.* That day, she took her daughter to stay with her former husband in the Denver area and had her car checked. The next day she drove to Omaha, Nebraska (a 9 or 10 hour drive), where her father had been flown to a major area hospital. Unfortunately, upon her leaving, she – and her parents – became immediately unreachable. On her deposition, she testified:

> Q.   []. Did you know that the phone numbers and the contact numbers that were in your records at the Polk company weren't any good?
>
> A.   No, I did not know that. I knew it afterwards. My parents had moved during that time.
>
> Q.   Did you know your parents had moved?
>
> A.   Yes, I did.
>
> Q.   Did you know that they were in your company records as emergency contacts?
>
> A.   I didn't think of changing them.
>
> Q.   Okay. You knew they had moved?

5

A.      Yes.

Q.      And from your testimony here, it doesn't seem like you had let anybody know how to get a hold of you.

A.      I hadn't been moved that long.  It was like from September – the end of September until October 1st, so I guess I just didn't have time to change my phone numbers and stuff like that with the company.[3]

(Aplt. App., Pl. at 157.)  By the 7th of October, Medley's father had had by-pass surgery, and that night she drove back to Denver and picked up her daughter.  The next day, still in Denver, she called a co-worker at Polk, Jimeen Campbell, to report how things were going and talked mainly about when she was coming back to work.  In the course of their discussion Medley said she was "here," which Campbell correctly took to mean that she was in Denver, not Nebraska.  But unfortunately, since her supervisors at Polk had tried to get in touch with her without success, Campbell also took "here" to mean that Medley had never gone to Nebraska at all.  Also unfortunately, on that call, Medley did not give Campbell any phone numbers to follow up.  The next call from Medley was five days later to Paul on October 13 after Paul had been trying to reach Medley through a number of sources without success.  Paul was at this point suspicious of what had happened and questioned whether Medley really wanted to keep the job, which Medley said she did.  Medley was in fact at that point in Nebraska.  Paul asked her to

_____

[3]Footnote by the Court: Given this, Medley's testimonial recollection that Campbell and Paul called her during the crucial period of October 2-16 is necessarily faulty.

6

come into the office the following morning (Tuesday, October 14) to talk, and after a discussion with her mother, who feared Medley would lose her position, Medley bought a plane ticket and flew back to Denver that night. However, she did not go the meeting in the office that next morning. She called the Polk Company but did not speak to anyone, only leaving a message that she "...wouldn't be able to make it." Later, on her deposition, she said it was because she was "tired." At the trial, she testified that she feared she was going to be fired, a fear that Medley did not convey to Paul. Medley did not come in the rest of the week, either, although she was in Denver, and never personally spoke with Paul to explain. Her testimony as to those days was:

> Q.    Now, you're not contending here, though [in Denver,] ma'am, that on October 13 and 14, 15, 16, 17 that you were on FMLA leave, are you?
>
> A.    No.

(Aplt. App., Tr. at 114.) When Medley did not appear for the said Tuesday meeting, Paul was quite distressed at being "stood up." Later that day, Medley did call M.J. Barnes, who worked in Polk's office of Human Resources. Both Medley and Barnes in their testimony are in agreement that Medley wanted some kind of leave of absence and that Barnes told her there were two types that she could have. One was FMLA and the other was personal leave. To obtain FMLA, Medley was told that she needed

7

documentation from her father's doctor that she was needed to care for her father.[4]

Although Medley's attorney in a pretrial submission to the Court erroneously set the date of the conversation with Barnes as October 6 (eight or nine days prior to it actually happening), Medley was unquestionably advised of the need for certification to entitle her to take FMLA leave. This certification is required by the FMLA statute which reads in § 2613:

> An employer may require that a request for leave . . . be supported by a certification issued by the health care provider . . . of the . . . parent of the employee . . . The employee shall provide, in a timely manner, a copy of such certification to the employer.

> Certification . . . shall be sufficient if it states . . . that the eligible employee is needed to care for the . . . parent and an estimate of the amount of time that such employee is needed to care for the parent . . .

29 U.S.C. § 2613(a), (b). Medley confirmed on the trial that she had been advised of this:

Q. Did [M.J. Barnes] tell you what options that you had?

A. Yes, she did.

Q. What did she tell you?

A. She told me that I had two options, family medical leave or personal leave, which had to be approved by Sheri Paul.

---

[4] Medley acknowledged the need for this documentation, in her Statement of Claim, Aplt. App., Pl. at 164.

8

Q. Well, what would you have to do for the family medical leave?

A. I had to get documentation from my father's doctor saying that I was needed - - that his medical care was to the point that he needed someone to be there with him and that my mother's condition was not stable enough to do this care by herself.

(Aplt. App., Tr. at 102.) Medley also testified she was aware she could get this certification but she declined to do it and further testified:

A. I kept asking and pretty much begging for leave. I just wanted personal leave. I didn't want to get paid for it. I just wanted leave.

(Aplt. App., Tr. at 104.) "Personal leave," however, had to be approved by Paul, and on October 16, the very next day, Paul finally reached Medley's father in Nebraska by telephone, who stated that he was doing fine, that Medley had gone back to Denver, and that his wife was back at work. Given these facts, Paul concluded that Medley was not "needed" to care for her father.

The foregoing conversations and suspicions were confirmed by the voice-mail Medley left for Paul on either the 16th or 17th of October, which in its entirety reads as follows:

Hi Sheri, this is Vickie. -um

I am sorry that I've put you through all this, Um I've just been having some pretty serious personal, emotional problems, um it wasn't all just my Dad. Lisa Black and Linda Sultanian came over the other night and kind of pulled me out of my funk and made me realize what I was really doing. Um, I don't really know what's

9

wrong, I've talked to someone yesterday for a little bit and - a - I'm gonna try and figure out what's going on um.

And I'm sorry you deserve to have someone at least return your phone calls and I haven't done that and apologize for that. You've been really good to me Sheri, and I'm sorry that - a - I didn't give you the respect back that you deserved. I just um know there's no excuse for it, but anyway, um, I've got to start making some decisions here and a.

What I would like is to have like a 4 week personal leave[5] so that I can pay for my insurance and go in and try & figure out what's going here one with me, um. Like I said, I don't know what it is yet. Um I haven't been taking those diet pills for quite some time - that's the first thing Lisa said to me. But - a - anyway, um, that's what I would like -um - I don't know if you are going to be able to do that for me. I more than likely at the end of that 4 weeks would resign, um - and if you aren't able to do that for me then I guess I'll just have to resign as of today, but I would like to be able to pay for my insurance for a few weeks to try and figure out what's going on. Uh, If you wanna have someone pack up my stuff for me I will stop by and pick it up on Monday. I do need to get, I've got my personal checks are up in the compartment up above my desk and I do need to get those so. Um, If nothing else I will come in and talk to you on Monday.

If you want to have MJ send me the leave information, the address there in Denver is:
>       4333 S. Atchinson Circle
>       Aurora, CO 80015
If you could do that that'd be great & we'll talk to you soon. Bye, Bye

(Aplt. App., Pl. at 229.) We feel constrained to note that in this extensive,

apologetic epilogue, Medley, in requesting four weeks of "personal leave," does not base

the plea on any "need" to care for her father, concerned though she doubtless was for him.

---

[5]Footnote by the Court: Not FMLA, which is confirmatory of the call with Barnes on October 15.

Against this background, Medley having at no time endeavored to comply with the FMLA statutory requirement to give Polk a letter from her father's doctor showing the "need" for her to care for her father, and having been unreachable for the first eleven days after she left, and having failed to come in for an agreed meeting on October 14 to discuss her future with the company, and, by her own testimonial admission, having not come in to work – although available – for almost the entire week of October 14,[6] and in a lengthy, apologetic voice-mail asking for four weeks more personal leave at the end of which she would "likely" resign, Paul's eventual authorization of Medley's termination for job abandonment on October 17 was a conclusion the jury could well have found Polk was honestly justified in reaching and was fully supported had the requested "Honest Belief Defense Charge" been given.[7]

While FMLA claims are reviewed under the *McDonnell Douglas* Title VII

------

[6] While the following was not known to Polk Company at the time, but came out in discovery, it is obviously confirmatory of what fellow Polk co-workers believed they saw as Medley's state of mind, and that is this: on October 15, days before Polk terminated her, and the very day Paul was finally able to speak with Medley's father, Medley, back in Denver, sent an employment resume by fax to the TransMeridian company at 2:45 in the afternoon, applying for a job (which she obtained).

[7] The only major question Medley raises to the aforementioned facts is that she testified that certain calls were made *to* her during the critical period October 3 through October 14, whereas the Polk Company personnel recall that the few of them that took place were *from* her, which had to be so, since Medley conceded that nowhere in the Polk records were there any phone numbers where she or her family could be reached. (*See* 5-6, *supra*).

discrimination framework,[8] here, after trial, we go directly to the District Court's charge which in essence told the jury that for the defendant to prevail, it must satisfy the jury that plaintiff had *in fact* abandoned the job which was the asserted motivation for the discharge (*see* fn. 2, *supra*).

The law, from a number of authorities at both the federal appellate and district court levels, is, however, uncontradictedly being pronounced that an employer who discharges an employee honestly believing that the employee has abandoned her job and is otherwise not using FMLA leave for its here "intended purpose",[9] to care for a parent, would not be in violation of FMLA, even if its conclusion is mistaken, since this would not be a discriminatory firing. This principle, upon examination, is no more than a logical appropriate application or extension of our holding in *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125 (10th Cir. 1998), that in an alleged age discrimination in employment case, a termination of plaintiff based on the employer's belief that plaintiff had sexually assaulted a co-worker "...would not be pretextual even if the belief was later found to be erroneous." *Id.* at 1129.

The germinal case applying this principle in an FMLA setting is *Kariotis v. Navistar Internat'l Trans. Corp.*, 131 F.3d 672 (7th Cir. 1997). There, in a discharge situation, while the employer may have been mistaken in concluding the employee had

---

[8]*See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

[9]29 U.S.C. § 2612(a)(1).

12

committed fraud in claiming a "serious health condition" under FMLA, the Court

concluded that at the very least the employer had an honest belief that she had done so.

That being so, the Court went on to spell this out:

> Discrimination statutes allow employers to discharge employees for almost any reason whatsoever (even a mistaken but honest belief) as long as the reason is not illegal discrimination. Thus when an employee is discharged because of an employer's honest mistake, federal anti-discrimination laws offer no protection. Likewise, when an employer discharges an employee because of inefficient work habits, excess absenteeism, an unacceptable attitude with customers and coworkers, or for a myriad of other reasons, anti-discrimination laws do not come into play.

* * *

> The problem for Kariotis [the employee] is that Navistar [the employer] has demonstrated that it honestly believed she was not on a legitimate FMLA leave[.]

*Kariotis*, 131 F.3d at 680-681. *See also Moughari v. Publix Super Markets*, 1998 WL

307454 (N.D. Fla.), *aff'd without opinion*, 170 F.3d 188 (11th Cir. 1999). There, the

District Court:

> [c]oncluded that Moughari was not using his [FMLA] leave time [for the birth of a child] for its intended purpose and was not being candid with his managers about his leave. Such termination did not constitute a violation of FMLA whether or not Moore's [Moughari's district manager] conclusion about Moughari's alleged improper use of leave time was correct, whether or not Moughari was on FMLA leave at the time, and whether or not Publix failed to properly advise Moughari about his FMLA rights. *See Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672 (7th Cir. 1997).

*Moughari*, 1998 WL 307454 at *2. *See also Stonum v. U.S. Airways, Inc.*, 83 F.Supp.2d

894, 903 n.12 (S.D. Ohio 1999) ("The critical issue is whether the Defendant maintained

13

a good-faith, reasonable belief that Stonum [the discharged employee] had abused her FMLA leave, and not whether the investigator did a flawless job.")

Given the foregoing recitation of evidence in this case, and the Polk Company having adequately requested the "honest belief" charge, it should have been given,[10] and on this record, a jury verdict accordingly would have been supportable. We therefore remand for a new trial accordingly.

Two matters remain. First, the District Court doubled the damages award under 29 U.S.C. § 2617(a)(1)(A)(iii) on its assessment of the trial record, stating simply:

> There has not been a sufficient showing that Polk demonstrated a good faith belief that plaintiff was misusing her leave, although she should have kept her employer better informed – and I think that came out in the evidence. An employer should not be allowed to fire an employee who leaves for a family illness without further inquiry, without further investigation to support its belief that an employee is faking the situation. And that was not done in this case.

(Apr. 24, 2000 hearing, Tr. at 12-13.) Obviously, on a new trial, should there be a jury verdict for Polk, any consideration of doubling the award has been mooted. On the other hand, should there be a jury award of damages to Medley, given our review of the record at 5-10, *supra*, an independent hearing before the Court should be held to permit the employer with relevant and specific detail to:

---

[10] *See Trejo v. Denver & R.G.W.R. Co.*, 568 F.2d 181, 184 (10th Cir. 1977) ("A party is entitled to an instruction based on his theory of the case if there is record evidence to support it. *See Lopez v. Southern Pacific Co.*, [499 F.2d 767, 772 (10th Cir. 1974)], and *General Motors Corp. v. Walden*, [406 F.2d 606, 608 (10 Cir. 1969)]").

...prove[] to the satisfaction of the court that the act or omission which violated section 2615 of this title was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of section 2615 of this title...

29 U.S.C. § 2617(a)(1)(A)(iii).  Second, under the parties' stipulation that issues as to Polk's counterclaim were for the Court, should there be a jury verdict for Medley on retrial, the counterclaims are to be dismissed.  On the other hand, in the event of a verdict for Polk on Medley's claim, the District Court is to award Polk $5,777.60 together with interest on its counterclaims.

Accordingly, the case is reversed and remanded for a new trial consistent with this opinion.