PER CURIAM.
Plaintiff-Appellant Eirik Tillman is a former employee of Defendant-Appellee Ohio Bell Telephone Company (“Ohio Bell”). In 2006, Tillman was diagnosed with lumbar degenerative disease, a chronic back condition. With the condition allegedly causing him exacerbated pain two to three days a month, Tillman requested, and was granted, intermittent leave pursuant to the Family Medical Leave Act (the “FMLA”) for use whenever his back pain flared up or when he had doctor’s appointments for treatment of his condition. Ohio Bell, however, began noticing suspicious patterns in the timing of Tillman’s requests for FMLA leave and initiated an investigation. The investigation led to the company’s determination that Tillman was abusing his FMLA leave, and he was ultimately terminated from his position.
Thereafter, Tillman filed an action in the United States District Court for the Northern District of Ohio alleging that Ohio Bell violated the FMLA “by interfering with, restraining or denying [him] the exercise of rights provided under the FMLA and/or retaliating against [him] by discharging him for asserting or otherwise exercising his rights under the FMLA.” (Compl. ¶ 20.) The district court entered summary judgment in favor of Ohio Bell on both the interference and retaliation claims. Tillman now appeals the grant of summary judgment. For the reasons stated below, we AFFIRM the district court’s decision.
I. FACTUAL BACKGROUND
Eirik Tillman began working for Ohio Bell Telephone Company as a Communications Technician in November 2000. (R. 50, Tillman Dep. at 27.) In 2004, he was *342 promoted to the position of Telecommunications Specialist (“TCS”). Like his original Communications Technician job, the TCS position was a union position, subject to the terms of a Collective Bargaining Agreement (“CBA”) between the company and the Communications Workers of America. (Id. at 30-31.)
Pursuant to the CBA, Telecommunications Specialists select their work shifts by seniority. As a low seniority TCS, Tillman was often required to work the less desirable evening, night and weekend shifts. His position entailed provisioning work, which involved technical work to fill customer orders for telephone and internet service, as well as maintenance work. (R. 44, Fuentes Dep. at 16-17.) The maintenance work consisted of investigating customer problems to determine whether the source of the problem was Ohio Bell’s internal systems or equipment, as opposed to external equipment or connections at the customer’s site.
The TCS job description lists lifting up to 100 pounds and climbing ladders as physical requirements of the position. (R. 45, Boyer Dep. at 25.) However, Tillman’s supervisors testified that technicians did not climb ladders on a daily basis, (R. 44, Fuentes Dep. at 20-21; R. 45, Boyer Dep. at 25), and rarely had to lift more than 15 pounds (R. 44, Fuentes Dep. at 20). Driving was also a routine function of the position.
Tillman’s Back Condition
In 2006, Tillman began suffering from severe back pain. (Compl. ¶ 10.) He was diagnosed with lumbar degenerative disk disease, a chronic back condition. (R. 51, Hoffman Dep. at 38, 75.) For this condition, Tillman treated with his family physician, Dr. Elizabeth Hoffman. According to Dr. Hoffman, as a result of this condition, Tillman experiences exacerbated pain two to three days a month. (Id. at 76.) Dr. Hoffman explained that on these days, the pain impairs Tillman’s “ability to lift, to carry heavy objects, to bend repeatedly, or actually bend at the waist.” (Id. at 78.) Dr. Hoffman testified that during these periods of pain an individual with Tillman’s condition would be expected to enter and exit a car “very carefully,” and would struggle to lift objects off the ground unless he was “bending at the knees and not at the waist.” (Id. at 71, 81.) Dr. Hoffman further testified that Tillman told her that when experiencing a period of severe period pain, he “had trouble walking for more than five or ten minutes at a time” without sitting down, and that he was only able to drive for short periods of time (no more than an hour). (Id. at 78.) The doctor further stated that Tillman was unable to predict in advance when he would have one of these periods of pain exacerbation.
Dr. Hoffman recommended various treatments for Tillman’s back condition, including prescription medication, physical therapy, weight loss, and avoiding exacerbating factors like heavy lifting. The medications that Dr. Hoffman prescribed to Tillman for his back condition, however, did not impair his ability to drive or work, nor cause any adverse side effects. (Id. at 23 25, 63, 71.)
As for physical therapy, Tillman only attended two physical therapy sessions at Total Rehab of Bedford, the rehabilitation facility to which Dr. Hoffman referred him, and he was discharged from Total Rehab in June of 2008. (Id. at 72-73.) Home exercises were recommended to Tillman following his discharge from Total Rehab. These home exercises did not involve any type of pre-scheduled appointments with physical therapists, nor was it medically necessary for Tillman to take time off from work to do them. (Id. at 39, 72-74.) Dr. Hoffman further testified that *343 there was no need for anyone else to be at home when Tillman performed his home therapy, adding that having someone else with him was neither medically necessary nor necessary for his safety. (Id. at 73-74.)
Although Dr. Hoffman indicated it was possible that the home exercises could cause exacerbated pain, she testified that Tillman never told her that the home exercises exacerbated his pain. {Id. at 106.) In fact, she testified that when she saw Tillman in May of 2009, he indicated that he was doing exercises at home and “feels better.” {Id. at 33.) Further, the FMLA certifications that Dr. Hoffman completed for Tillman in 2008 and 2009 did not indicate a need for leave due to pain or incapacity while recovering from home exercises or any other type of treatments for his back condition. Indeed, Dr. Hoffman affirmatively indicated on the certification forms that the treatments she recommended for Tillman (prescription medications and physical therapy) would not lead to periods of incapacity. {Id. at 83-91; see also R. 50, Tillman Dep. Exs. I K.)
Tillman’s Use of FMLA Leave
In December of 2006, Tillman began requesting and receiving fully-paid intermittent FMLA leave for his back condition. (R. 32, Ex. G, Affidavit of Mary Glass ¶ 11.) These intermittent FMLA leave requests/grants continued for the next three years. In 2007, Tillman was granted paid intermittent FMLA leave for his back condition for two to six days per month in January, February, March, April, October, November and December. {Id. ¶¶ 11 22.) During October, November, and December of 2007, his FMLA days routinely fell on Fridays and weekends, resulting in him having three-day or four-day weekends for at least one weekend in October, three weekends during November and another three weekends in December, including the weekend preceding the New Year’s holiday. {Id. ¶¶ 12 22.)
In 2008, Tillman was on short-term disability for approximately two and a half weeks in February for nasal adhesions, which also counted as FMLA leave time. (Id. ¶ 23.) Then, in May of 2008, Tillman again sought paid intermittent FMLA leave relating to his back condition. (Id. ¶ 24.) With the exception of August and September of 2008, Plaintiff requested three days of paid FMLA leave every month from May of 2008 until April of 2009. (Id. ¶¶ 24 39.)
The fully paid FMLA leave days that Tillman requested throughout 2008 also regularly fell on Fridays and/or weekends and were frequently adjacent to already-scheduled days off or holidays, which extended his time off from work and often provided him with three-day and four-day weekends. For example, Tillman took June 12 through 14 (Thursday through Saturday) off due to FMLA reasons when he was already scheduled off for Sunday and Monday June 15 and 16th. (Id. ¶ 25.) In July, he took an FMLA day on Saturday, July 12, which was followed by two scheduled days off on Sunday and Monday, July 13 and 14. (Id. ¶ 26.) In August, one of Tillman’s FMLA days fell on Friday, August 8, and was followed by nine scheduled days off. (Id. ¶ 29.) Similar patterns occurred in October and December. (Id. ¶¶ 30, 33.) Tillman also took FMLA leave on December 31 and January 1, 2, and 3, resulting in four consecutive days off over the New Year’s holiday for a second year in a row. (Id. ¶¶ 35-36.[1])
*344 Even though Dr. Hoffman testified that Tillman could not predict when he was going to have a flare up of his back pain, Tillman often notified his supervisor in advance that he intended to use FMLA leave time on a future date. For example, on December 12, 2007, Tillman e-mailed his supervisor, Antone Boyer, to tell him he would be on FMLA December 14 through 16, 2007. (R. 32, Ex. A, Tillman Dep. at 113 & Dep. Ex. Q.) The very next day, Tillman advised the same supervisor he would also be “off’ several days in the coming weeks, including December 21 through 23, 2007 and December 29, 2007, “due to FMLA.” (Id. at 113-14 & Dep. Ex. R.) Similarly, on June 27, 2008, Tillman emailed his supervisor to tell him that he would be taking FMLA leave “due to my therapy” on July 12, 19, and 26 three of the four Saturdays falling in that month. (Id. at 118-19 & Dep. Ex. X.)
On July 23, 2008, Tillman advised his supervisor over a week in advance that he would be using a FMLA day on Saturday, August 2. (Id. at 121 & Dep. Ex. Z.) On December 1, 2008, Tillman sent an e-mail to his supervisor Tony Fuentes stating, “If I end up on evenings due to seniority, I’m letting you knowing [sic] in advance I will be using a FMLA day on Dec. 13.” (Id. at 121-23 & Dep. Ex. AA.) Tillman sent another e-mail to Fuentes on December 17, 2008, advising Fuentes two weeks in advance that he planned to use FMLA leave around the New Year’s holiday, on December 31, January 2, and January 3. (Id. at 123-24 & Dep. Ex. BB.)
Investigation into Tillman’s Use of FMLA Leave
Tillman’s co-workers and supervisors began noticing these patterns in Tillman’s FMLA leave (i.e., Saturdays, extended weekends and vacations and “forecasting” his incapacity in advance) and complained to Area Manager Ann Taylor about Tillman’s absences and suspicious use of FMLA leave. (R. 52, Taylor Dep. at 31-46.) Taylor asked the supervisors to provide her with information substantiating the complaints. (Id. at 32, 43.) After reviewing the information provided by the supervisors, Taylor observed for herself the patterns in Tillman’s FMLA leave, and suspected that misuse of FMLA time was occurring. (Id. at 47.)
On November 5, 2008, Taylor took the issue to Human Resources. The Human Resources representative recommended that she submit an RFI (Request for Investigation) to the FMLA Department. (Id. at 46-47, 52-53, 59.) The RFI was submitted to Mary Glass, FMLA Manager/Asset Protection Liaison. (R. 32, Ex. H, Glass Dep. at 45-46.) Glass is responsible for reviewing all Requests for Investigation into FMLA leave abuse within the AT & T family of companies, which included Ohio Bell. (R. 32, Ex. G, Glass Aff. ¶ 2.) Glass believed Tillman’s FMLA use was suspicious based on his forecasting of FMLA absences in advance and the patterns of adding FMLA leave to his already-scheduled days off to extend his periods of time off work. On or about December 23, 2008, after Glass was provided with additional information that further substantiated Tillman’s practice of predicting his FMLA absences and after she learned that Tillman’s assigned shift might be changing to days (making it easier to observe and verify his activities that *345 it would have been when he was working a night shift), she approved the Request for Investigation of Tillman’s use of FMLA leave (R. 32, Ex. H, Glass Dep. at 53-54, 58-59), and then turned the matter over to the company’s Asset Protection Department to conduct the investigation (id. at 61).
Tillman’s case was assigned to Investigator Patrick McCreary. (R. 32, Ex. D, McCreary Dep. at 57-58.) McCreary asked that Taylor forward him any information regarding days that Tillman called off for FMLA. (R. 52, Taylor Dep. at 62.) McCreary thereafter hired an outside private investigation company to conduct surveillance of Tillman on the days and during the work hours that Tillman requested off as FMLA leave. (R. 32, Ex. D, McCreary Dep. at 45, 62.)
Surveillance
On Sunday, March 15, 2009, Tillman was observed working in his yard and in his garage for approximately two hours. (Id. at 70 79 & Dep. Ex. 9.) On Saturday, March 28, 2009, Tillman was observed driving his family around for approximately two hours, conducting a number of personal errands such as stopping for coffee and visiting a sporting goods store, a department store, and a dental office, exiting and entering his car at each stop. Upon returning home, Tillman was observed working in his garage for about an hour during which time he was observed repeatedly bending down and lifting pieces of wood trim and carrying them into his house. (Id. at 70 79 & Dep. Exs. 9, 14.) He was observed making at least seven trips back and forth between his garage and his house. All of these activities were captured on video. (Id. at 79.[2])
Medical Review
On April 3, 2009, at Glass’s direction, McCreary provided the surveillance report and the DVD compilation of the surveillance video to Dr. Shirley Conibear, M.D., an outside medical consultant retained by AT & T, for review. (R. 32, Ex. D, McCreary Dep. at 46 47; Ex. H, Glass Dep. at 35-62.) Dr. Conibear issued a report on April 10, 2009. (R. 32, Ex. L, Conibear Dep. at 36 & Dep. Ex. 14; Ex. D, McCreary Dep. at 120 & Dep. Ex. 14; Ex. H, Glass Dep. at 67 & Dep. Ex. 14.) In preparing her report, Dr. Conibear reviewed two FMLA Certification forms signed by Dr. Hoffman, one of which was faxed to the company on February 10, 2009 and the other on March 10, 2009; the job description for the Telecommunications Specialist position; and the private investigator’s surveillance DVD and written surveillance log. (R. 32, Ex. L, Conibear Dep. at 36.)
Dr. Conibear’s report included an analysis of what she observed on the surveillance DVD of Tillman’s activities on March 15 and 28, 2009. Dr. Conibear stated that she observed that Tillman “bent at the waist and stood again without any sign of pain, stiffness, or weakness,” was able to “reach[ ] above his head and t[ake] objects down [from above],” could “carr[y] objects outside the garage, and place[] them on the ground, and move[] objects from one location to another with one hand.” (R. 32, Ex. L, Conibear Dep. Ex. 14, Conibear *346 Report at 2.) She also saw that Tillman was able to “squat[ ] or kneel[ ]” and then “st[and] erect again without hesitation.” (Id.) She further noted that Tillman “walked and stood without any sign of stiffness, weakness or pain,” and that “[h]is actions were brisk and without hesitation.” (Id.) He could “enter and exit from his vehicle without using his hands to support or brace his body” and “[h]e twisted with his hand behind his back to close the door as he walked away.” (Id.) Dr. Conibear further observed that Tillman “did not limp or favor a leg when walking,” and “[h]is gait was smooth, easy, and symmetric with normal arm swing.” (Id.) She also observed that “[h]e did not splint his back with his arm or hand” and there was “no indication that he was in pain” either “in his movements [or] his facial expressions.” (Id.)
Based on her observations, Dr. Conibear concluded that, in her professional opinion, Tillman’s activities on March 15 and March 28, 2009 were inconsistent with the physical behaviors typical of someone with incapacitating back pain and that he was not incapacitated, as defined by the FMLA, from performing his work duties as a Telecommunications Specialist on those dates. (Id. at 3.)
Tillman’s Interview with Investigator McCreary
On April 16, 2009, Patrick McCreary met with Tillman and interviewed him regarding his FMLA usage. (R. 82, Ex. D, McCreary Dep. at 81-96 & Dep. Ex. H.) According to McCreary, during the interview, Tillman indicated that he used FMLA on weekends for convenience because he did not have time to do his home exercises during the week while he was “too busy” with other activities, such as “driving people around.” (Id.[3]) When asked if he could recall his activities on March 15 or March 28, Tillman could not specifically recall but he suggested that he may have been able to engage in some of the physical activities he did because “maybe” his doctor had given him a shot of Cortisone earlier in the day. (Id.) Tillman also stated that he may have been under the influence of Oxycodone or Percocet and, therefore, would not have been suited to operate a company vehicle. (Id.[4])
At the end of the interview, and in Mr. Tillman’s presence, McCreary typed up a Statement based on the interview and gave it to Tillman for his and his Union representative’s review, and asked Tillman to make any necessary corrections and to sign it. (Id. at 92-96.) Although Tillman did not ask to make any changes in the Statement and did not indicate to Mr. McCreary that anything in the Statement was inaccurate, he refused to sign it. (Id.)
Following the interview, Tillman was suspended pending further investigation. (R. 52, Taylor Dep. at 90-91; R. 44, Fuentes Dep. at 57-58.)
Denial of Tillman’s March 15 and 28, 2009 FMLA Leave Requests and Termination
As a result of the investigation, on April 17, 2009, Glass denied Tillman’s request *347 for FMLA leave time for his absences on March 15 and March 28. (R. 32, Ex. H, Glass Dep. at 64; R. 41 & 42, McCreary Dep. at 101.) Glass’s decision to deny FMLA leave for these absences was based on the surveillance observations, Tillman’s statements in Patrick McCreary’s interview, Dr. Conibear’s report, Tillman’s email to his supervisor indicating he would take FMLA leave on December 13 if he got assigned to the night shift, and the pattern of using FMLA days on weekends or combined with his days off and holidays to extend his time away from work. (R. 32, Ex. H, Glass Dep. at 65-66.)
The findings of the investigation, including the denial of FMLA leave for the two dates in March, were subsequently reported to management. Area Manager Ann Taylor reviewed the Asset Protection Investigation Report and the surveillance tapes, and conferred with the vice president and director to whom she reported. Taylor also discussed the investigation results with Human Resources and Labor Relations staff. Based on their review of the investigation findings, including the denial of FMLA leave for March 15 and March 28, 2009, the decision was made that Tillman’s employment should be terminated. (R. 52, Taylor Dep. at 92-95.)
Dismissal Review Board proceedings, required by the CBA, were conducted on May 11, 2009. (See R. 32, Ex. I, Affidavit of Bryan Redfern ¶ 4.) At the hearing, Labor Relations Manager Brian Redfern reviewed the AT & T Code of Business Conduct, which provides, in pertinent part:
Fraudulent or illegal conduct committed on or off the job may be grounds for disciplinary action, up to and including dismissal.
Fraudulent or illegal conduct includes, but is not limited to, any oral or written misrepresentation of facts, misappropriation of funds, theft, improper reporting of time or expenses, wrongfully claiming employee or dependent benefits, or any other dishonest acts, done on or off the job, and whether done while working for an SBC company or elsewhere, or prior to employment with SBC.
(Id. ¶ 5; R. 32, Ex. J, Responses to Plaintiffs 1st Set of Interrogatories at No. 6; Ex. A, Tillman Dep. at 35-37 & Dep. Ex. E at 9.[5]) Tillman was terminated pursuant to this provision. (R. 32, Ex. I, Redfern Aff. ¶ 5.)
Following the Dismissal Board hearing, the company upheld its original decision, and Tillman’s employment was terminated, effective May 15, 2009. (Id. ¶ 6 & Ex. 1.) Tillman’s Union declined to contest the matter through the arbitration process. (R. 50, Tillman Dep. at 101-102.)
II. ANALYSIS
A. STANDARD OF REVIEW
We review the district court’s grant of summary judgment de novo, using the same standard of review applicable in the district court. Gecewicz v. Henry Ford Macomb Hosp. Corp., 683 F.3d 316, 321 (6th Cir.2012). Summary judgment is proper if, viewing the facts and drawing all inferences in the light most favorable to the nonmoving party, “ ‘the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.’ ” Bruederle v. Louisville Metro Gov’t, 687 F.3d 771, 776 (6th Cir.2012) (quoting Fed.R.Civ.P. 56(a)). “A genuine issue of material fact exists when there is sufficient evidence for a trier of fact to find for the non-moving *348 party.” Ciminillo v. Streicher, 434 F.3d 461, 464 (6th Cir.2006). “A ‘mere scintilla’ of evidence, however, is not enough for the non-moving party to withstand summary judgment.” La Quinta Corp. v. Heartland Props., LLC, 603 F.3d 327, 335 (6th Cir.2010) (citing Ciminillo, 434 F.3d at 464).
Further, in ruling on a district court’s grant of summary judgment, an appellate court does not have to rely on the same reasons that persuaded the lower court. See, e.g., City Mgmt. Corp. v. U.S. Chem. Co., 43 F.3d 244, 251 (6th Cir.1994) (explaining that an appellate court may affirm a decision of the district court if that decision is correct for any reason, including a reason not considered by the district court); Herm v. Stafford, 663 F.2d 669, 684 (6th Cir.1981) (“An appellate court can find an alternative basis for concluding that a party is entitled to summary judgment and ignore any erroneous basis relied upon by the district court, provided [that] the opposing party is not denied an opportunity to respond to the new theory”).
In this appeal, Plaintiff-Appellant Tillman contends that the district court erred in granting Defendant’s motion for summary judgment on his FMLA retaliation claim by concluding that the “honest belief’ rule protected Ohio Bell’s termination decision. He also argues that the district court erred in finding that the “honest belief’ rule also applied to his FMLA interference claim. The Court will address each of Plaintiffs arguments in turn.
B. THE DISTRICT COURT CORRECTLY APPLIED THE “HONEST BELIEF” RULE IN GRANTING SUMMARY JUDGMENT ON PLAINTIFF’S FMLA RETALIATION CLAIM
The Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 et seq. (the “FMLA”), entitles eligible employees to a total of 12 weeks of leave per year for various reasons, including because of “a serious health condition that makes the employee unable to perform the functions” of his or her position. 29 U.S.C. § 2612(a)(1)(D). When medically necessary, such leave may be taken intermittently or on a reduced leave schedule. Id. § 2612(b)(1). The Act further entitles an eligible employee who takes a leave under § 2612 for the intended purpose of the leave to be reinstated upon his return from leave to the position he held before the leave or to an equivalent position. See id. § 2614(a)(1).
This Court recognizes two distinct theories for recovery under the FMLA: (1) the “entitlement” or “interference” theory arising under 29 U.S.C. § 2615(a)(1), and (2) the “retaliation” or “discrimination” theory arising under 29 U.S.C. § 2615(a)(2). Seeger v. Cincinnati Bell Tel. Co., 681 F.3d 274, 282 (6th Cir.2012).
To establish a prima facie case of FMLA retaliation, a plaintiff must show by a preponderance of the evidence that (1) he was engaged in an activity protected by the FMLA; (2) the employer knew that he was exercising his rights under the FMLA; (3) after learning of the employee’s exercise of FMLA rights, the employer took an employment action adverse to him; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action. Seeger, 681 F.3d at 283; Donald v. Sybra, Inc., 667 F.3d 757, 761 (6th Cir.2012). Where a plaintiff relies on indirect evidence, we evaluate the claim under the McDonnell Douglas[6] burden-shifting framework. Seeger, 681 F.3d at 283; Donald, 667 F.3d at 762; Edgar v. JAC Prods., Inc., 443 *349 F.3d 501, 508 (6th Cir.2006). Thus, once a plaintiff offers sufficient indirect evidence to support his prima facie FMLA claim, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment decision. McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. 1817; Seeger, 681 F.3d at 284. If the employer articulates a legitimate reason for its action, the burden of production shifts back to the plaintiff to demonstrate pretext. Seeger, 681 F.3d at 285. A plaintiff may show pretext by demonstrating that the proffered reason (1) had no basis in fact; (2) did not actually motivate the action; or (3) was insufficient to warrant the action. Id.; Smith v. Chrysler Corp., 155 F.3d 799, 805-06 (6th Cir.1998).
The district court began its analysis at step two of the McDonnell Douglas framework, the employer’s justification for the adverse act. In this case, Ohio Bell proffered a legitimate, non-discriminatory reason for Tillman’s termination: his abuse of FMLA leave and his corresponding violation of the company’s Code of Business Conduct. Tillman disputes that he abused his FMLA leave, and, thus, Ohio Bell did not actually have cause to discharge him. This is essentially a “no basis in fact” pretext claim.
However, as the district court properly recognized, the “honest belief’ rule defeats this type of pretext argument. “[A]s long as an employer has an honest belief in its proffered non-discriminatory reason,” the employee cannot establish pretext simply because the reason is ultimately shown to be incorrect. Majewski v. Automatic Data Processing, Inc., 274 F.3d 1106, 1117 (6th Cir.2001); see also Smith, 155 F.3d at 806 (6th Cir.1998) (“[S]o long as the employer honestly believed in the proffered reason given for its employment action, the employee cannot establish pretext even if the employer’s reason is ultimately found to be mistaken, foolish, trivial, or baseless.”). When the “honest belief’ rule is invoked, to establish pretext, “the plaintiff must allege more than a dispute over the facts upon which his discharge was based. He must put forth evidence which demonstrates that the employer did not ‘honestly believe’ in the proffered non-discriminatory reason for its adverse employment action.” Braithwaite v. Timken Co., 258 F.3d 488, 493-94 (6th Cir.2001) (citing Smith, 155 F.3d at 806-07). Our cases have extended the “honest belief’ rule to FMLA retaliation cases. E.g., Seeger, 681 F.3d at 285-87; Donald, 667 F.3d at 763.
In determining whether Defendant had an “honest belief’ in the proffered basis for discharge, we examine whether Ohio Bell has established a “reasonable reliance” on the particularized facts that were before it at the time the decision was made. Abdulnour v. Campbell Soup Supply Co., 502 F.3d 496, 502-03 (6th Cir.2007); Braithwaite, 258 F.3d at 494. Yet, in determining whether an employer reasonably relied on the particularized facts before it, we do not require that the deci-sional process used by the employer “be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action.” Seeger, 681 F.3d at 285 (quoting Smith, 155 F.3d at 807).
The district court correctly held that Ohio Bell held an honest belief that Tillman had abused his FMLA leave and violated the company Code of Business Conduct. In making the decision to discharge Tillman, Ohio Bell relied on the Asset Protection Investigation Report and the surveillance tapes of Tillman’s activities on March 15 and 28, 2009; Tillman’s statements in Patrick McCreary’s inter *350 view; Dr. Conibear’s report in which she concluded that the video-taped activities of Tillman on March 15 and 28 were inconsistent with the physical behaviors typical of someone with incapacitating back pain, and that he was not incapacitated from performing his work duties on those dates; Tillman’s e-mail to his supervisor indicating he would take FMLA leave on December 13, 2008 if he got assigned to the night shift; and the pattern observed over a period of nearly two and a half years of Tillman’s use of FMLA leave days on weekends or combined with his days off and holidays to extend his time away from work.
Tillman does not deny that he engaged in the activities the private investigator observed and videotaped on March 15 and 28, 2009. He nonetheless argues that the district court erred in concluding that Ohio Bell had an honest belief that his actions were inconsistent with the back condition for which he had been granted intermittent FMLA leave. He also argues that his case is analogous to Weimer v. Honda of America Manufacturing, Inc., No. 2:06-cv-844, 2008 WL 2421648 (S.D.Ohio June 12, 2008), in which the district court denied the parties’ cross-motions for summary judgment finding that a material issue of fact existed as to whether the plaintiffs employer honestly believed that the plaintiff exceeded the scope of his leave. Yet, contrary to Plaintiffs assertion, the Weimer court did not deny summary judgment simply because it concluded that “what functions of a job are ‘essential’ is a factual dispute.” (Appellant’s Br. at 17.) Rather, summary judgment was denied because “[t]he parties ... failed to present sufficient evidence of what tasks and demands constituted Plaintiffs job with Defendant. Absent this information, the Court cannot say whether the work Plaintiff apparently performed on his porch demonstrated that he could perform the essential tasks of his job.” 2008 WL 2421648, at *5. There is no insufficiency of such evidence in this case.
Tillman also does not deny that he frequently exercised his FMLA leave time on weekends or adjacent to scheduled days off or that he “forecasted” his leave days in advance. He argues that he did so because his supervisor, Antone Boyer, asked for advance notice. However, Boyer testified that he asked employees to provide him with advance notice “if possible,” and Plaintiffs own treating physician testified that Tillman was unable to predict in advance when he would experience an exacerbation of his back pain.
Finally, it was entirely proper for Ohio Bell to also consider the report of Dr. Conibear in forming its honest belief. Dr. Conibear reviewed the DVD and log of the surveillance of Tillman on March 15 and 28, 2009, the job description for Tillman’s Telecommunications Specialist position, and Dr. Hoffman’s 2009 FMLA certifications. As indicated in her report, she observed in the surveillance DVD that Tillman bent at the waist and stood again without any sign of pain, stiffness, or weakness, made several trips in and out of the garage carrying large objects and was able to squat or kneel and then “st[and] erect again without hesitation.” She further noted that Tillman walked briskly and fluidly without any sign of pain or weakness, and that he was able to enter and exit from his car with ease and without having to support or brace his body. Based on her observations, Dr. Conibear concluded that, in her professional opinion, Tillman’s activities on March 15 and 28, 2009 were inconsistent with how someone with incapacitating back pain would act.
Tillman does not challenge Dr. Coni-bear’s medical expertise. Rather, he argues that she should have discussed the matter with his personal physician and *351 should have inquired about the specific weight of the objects she observed him carrying in the video before rendering her opinion. Yet, as indicated above, we do not require that an investigation “be optimal or that it left no stone unturned.” Seeger, 681 F.3d at 285 (citation omitted).
In sum, we find that the record reflects that Ohio Bell made a reasonably informed and considered decision based upon the particularized facts before it at the time. We, therefore, conclude that the district court did not err in granting Defendant’s motion for summary judgment on Plaintiffs FMLA retaliation claim by concluding that the “honest belief’ rule protected Ohio Bell’s termination decision.
C. SUMMARY JUDGMENT WAS ALSO PROPERLY ENTERED ON PLAINTIFF’S FMLA INTERFERENCE CLAIM
The district court’s use of the “honest belief1’ rule in denying Tillman’s interference claim, however, presents a more difficult issue because of conflicting authority in our Circuit. We begin with the statutory language and settled interference-claim principles.
The interference provision of the FMLA makes it “unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise any right provided in [the Act].” 29 U.S.C. § 2615(a)(1). Also known as an FMLA “entitlement” claim, the employer violates the act if it interferes with an FMLA-ereated right to medical leave or reinstatement after a qualified leave. Arban v. West Publ’g Corp., 345 F.3d 390, 400-01 (6th Cir.2003). Though our cases recognize some overlap between the interference and retaliation theories, see Weimer v. Honda of Am. Mfg., Inc., 356 Fed.Appx. 812, 815 (6th Cir.2009) (citing Skrjanc v. Great Lakes Power Serv. Co., 272 F.3d 309, 314 (6th Cir.2001)), “the requisite proofs differ,” Seeger, 681 F.3d at 282. A prima facie case of FMLA interference requires the plaintiff to show that (1) he is an eligible employee; (2) the defendant is an employer as defined in the Act; (3) he was entitled to leave under the FMLA; (4) he gave the defendant notice of his intention to take leave; and (5) the defendant denied him FMLA benefits to which he was entitled. Donald, 667 F.3d at 761 (citations omitted). As with retaliation claims, the McDonnell Douglas framework applies, meaning that the employer must respond to the prima facie case with evidence that “it had a legitimate reason unrelated to the exercise of FMLA rights for terminating the employee,” whereupon the plaintiff must show pretext. Id. at 762. No one disputes these basic principles, yet they leave unanswered today’s question: does an employer’s honest belief that the employee abused FMLA benefits defeat the employee’s claim to those benefits.
The “honest belief’ defense fits neatly into the retaliation context, where the legal standard inherently demands an employer’s culpable mental state i.e., that the employee’s exercise of FMLA rights caused the employer to discriminate against the employee. 29 U.S.C. § 2615(a)(2) (“It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual/or opposing any practice made unlawful by this subchapter.” (emphasis added)); Donald, 667 F.3d at 761. Absent pretext, an employer’s honest belief of FMLA abuse defeats causation; the employer did not retaliate against the employee for exercising FMLA rights, but punished the employee for perceived misconduct. By its terms, however, the interference claim lacks this inherent scienter requirement; it simply prohibits “interfering] with, restraining], or denying] the exercise of *352 [FMLA rights].” 29 U.S.C. § 2615(a)(1). An employer who honestly, but mistakenly believes that the employee abused his FMLA leave can still be said to have interfered with, restrained, and/or denied the exercise of those rights.
Our recent decision in Seeger explored the contours of these different FMLA claims.
The interference theory has its roots in the FMLA’s creation of substantive rights, and “[i]f an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave, a violation has occurred,” regardless of the intent of the employer. The central issue raised by the retaliation theory, on the other hand, is “whether the employer took the adverse action because of a prohibited reason or for a legitimate non-discrimihatory reason.” In contrast to the interference theory, “[t]he employer’s motive is relevant because retaliation claims impose liability on employers that act against employees specifically because those employees invoked their FMLA rights.”
681 F.3d at 282 (citations omitted). Acknowledging these differences, our interference-claim precedents repeatedly disclaim consideration of the employer’s intent. Id,.; Edgar, 443 F.3d at 508 (“The employer’s intent is not a relevant part of the [interference] inquiry under [the FMLA].”); Arban, 345 F.3d at 401 (“Because the issue is the right to an entitlement, the employee is due the benefit if the statutory requirements are satisfied, regardless of the intent of the employer.” (quoting Hodgens v. General Dynamics Corp., 144 F.3d 151, 159 (1st Cir.1998))). Other circuits echo this principle. See, e.g., Sanders v. City of Newport, 657 F.3d 772, 779 (9th Cir.2011); Colburn v. Parker Hannifin/Nichols Portland Div., 429 F.3d 325, 332 (1st Cir.2005); Smith v. Diffee Ford-Lincoln-Mercury, Inc., 298 F.3d 955, 960 (10th Cir.2002); King v. Preferred Technical Grp., 166 F.3d 887, 891 (7th Cir.1999).[7] Though Edgar and Arban do not address claims of FMLA abuse,[8] they caution against applying this sort of “honest belief’ rule to interference claims.
Nevertheless, two of our unpublished cases sanction the “honest belief’ defense in cases involving interference claims. These decisions rejected challenges to jury instructions including the defense. Adams v. Auto Rail Logistics, Inc., 504 Fed.Appx. 453, 457-58 (6th Cir.2012) (reasoning that the employer “need only demonstrate that it believed that the plaintiff was misusing the FMLA such that it would have discharged the plaintiff despite any legitimate FMLA leave”); Weimer, 356 Fed.Appx. at 819 (sustaining instruction that permitted the jury to decide whether, in firing the employee who requested FMLA leave, the employer honestly believed the plaintiff misrepresented his need for leave). Neither decision offers much guidance for this case. Adams did not attempt to square its *353 holding with our precedents precluding consideration of the employer’s intent, and the alleged leave abuse consisted of the employee’s reliance on the employer’s instruction not to return to work until he submitted a medical certification, not the employee’s fraudulent leave request. Adams, 504 Fed.Appx. at 454-55 (noting that the employee admitted he did not need the leave to care for his sick daughter after the first day, but that he stayed home because of the supervisor’s instructions). Weimer, meanwhile, bears a closer resemblance to the “honest belief’ defense advanced in this case, in that the employer presented surveillance evidence that the employee misrepresented his medical condition to obtain leave. 356 Fed.Appx. at 819. Still, the court cautioned that its approval of the “honest belief’ instruction did not permit the employer “to escape liability if [the employee] had a serious health condition, but the employer harbored an ‘honestly held belief that he did not have a serious health condition.” Id. (explaining that the instruction “properly directed [the jury] to focus on whether causation was or was not established”). The conflicting signals in that decision likely reflect the panel’s view that the jury instructions in Arban wrongly merged the interference theory into the retaliation claim. See id. at 816-17 (noting “an apparent flaw in this circuit’s FMLA jurisprudence”). Weimer does likewise, considering the employee’s claim under the FMLA retaliation standard despite designating it an interference claim. See id. at 815-19 (approving the district court’s use of the retaliation standard and proceeding to consider causation).
Our recent precedential decision in Donald v. Sybra, Inc., authored by a member of this panel, also generally approved the “honest belief’ defense in affirming the district court’s grant of summary judgment to the employer. 667 F.3d at 763. But, as a later panel observed, Donald did not specify which claim (retaliation or interference) the defense defeated. See Jaszczyszyn v. Advantage Health Physician Network, 504 Fed.Appx. 440, 447-49 (6th Cir.2012) (viewing Donald as agnostic regarding whether the “honest belief’ rule applies to FMLA interference claims). And the employer’s “honest belief’ examined in Donald that the employee stole from the company, Donald, 667 F.3d at 763 was a “legitimate reason unrelated to the exercise of FMLA rights for terminating the employee,” id. at 762 (emphasis added). In any event, Donald offers no endorsement of an “honest belief’ defense directly related to the exercise of FMLA rights: the employer’s belief that the employee misrepresented his medical condition to obtain improper FMLA leave.
We acknowledge that three other circuits allow the “honest belief’ defense to interference claims. See Scruggs v. Carrier Corp., 688 F.3d 821, 825-26 (7th Cir.2012); Parker v. Verizon Pa., Inc., 309 Fed.Appx. 551, 563 (3d Cir.2009); Medley v. Polk Co., 260 F.3d 1202, 1207-08 (10th Cir.2001). This line of decisions appears to trace to the Seventh Circuit’s decision in Kariotis v. Navistar International Transportation Corp., 131 F.3d 672 (7th Cir.1997). See Medley, 260 F.3d at 1208 (referring to Kariotis as the “germinal case” for this rule). But that decision not only failed to distinguish between FMLA retaliation and interference claims appearing to address the former, see Kariotis, 131 F.3d at 679-81 (distinguishing “discrimination” claims, including the FMLA claim, from the strict-liability COBRA claim) but it also rested its “honest belief’ ruling on a single regulation: 29 C.F.R. § 825.216(a)’s statement that “An employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously em *354 ployed during the FMLA leave period.” To this, the Third Circuit added 29 U.S.C. § 2614(a)(3)(B)’s likeminded assurance that FMLA’s leave provision “shall [not] be construed to entitle any restored employee to ... any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave.” See Parker, 309 Fed.Appx. at 562. In our view, neither of these provisions support the broad inference these courts (and our concurring colleague) make: that an employer may defeat an interference claim solely on the basis of its honest belief (even if mistaken) that the employee wrongfully claimed FMLA leave.
Today’s case does not require us to resolve this thorny issue, however, because Tillman failed to show entitlement to FMLA leave in the first place. See, e.g., City Mgmt. Corp., 43 F.3d at 251 (explaining that an appellate court may affirm on alternative grounds supported by the record). As explained, interference claims require a plaintiff to show that his employer denied FMLA benefits to which he was entitled. Donald, 667 F.3d at 761 (citations omitted). For Tillman, that means he needed to qualify for FMLA leave on or about the dates in question. See, e.g., Clark v. Walgreen Co., 424 Fed.Appx. 467, 474 (6th Cir.2011) (citing Wysong v. Dow Chem. Co., 503 F.3d 441, 447 (6th Cir.2007)); Branham v. Gannett Satellite Info. Network, Inc., 619 F.3d 563, 568 (6th Cir.2010). Specifically, he needed to present evidence that he suffered from a “serious health condition that ma[de] [him] unable to perform the functions of [his job].” 29 U.S.C. § 2612(a)(1)(D); 29 C.F.R. § 825.112(a)(4). Importantly, the FMLA predicates leave, and the accompanying entitlement to reinstatement, upon eligible employees “tak[ing] leave ... for the intended purpose of the leave.” 29 U.S.C. § 2614(a)(1) (emphasis added).
Both before the district court and on appeal, Ohio Bell advanced an alternative theory for summary judgment on the interference claim: that Plaintiff failed to show entitlement to FMLA leave for the dates in question, March 15 and 28, 2009. (R. 32, SJ Br. at 23-25; Appellee’s Br. at 35-40.) To avoid summary judgment, then, the burden shifted to Plaintiff to come forward with evidence presenting a genuine issue of fact regarding his entitlement to FMLA leave. Fed.R.Civ.P. 56(c)(1) (obliging “[a] party asserting that a fact ... is genuinely disputed [to] support the assertion by ... citing to particular parts of materials in the record ... or ... showing that the materials cited do not establish the absence or presence of a genuine dispute”); Horton v. Potter, 369 F.3d 906, 909 (6th Cir.2004) (“Once the moving party has met its burden of production, the nonmoving party must go beyond the pleadings and by ... affidavits, or by the ‘depositions, answers to interrogatories, and admissions on file,’ designate ‘specific facts showing that there is a genuine issue for trial.’ ”); see also Tucker v. Tennessee, 539 F.3d 526, 531 (6th Cir.2008) (explaining that the court “no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact” (citation omitted)). Despite ample notice that Ohio Bell challenged his leave on March 15 and 28, 2009, Tillman offered no evidence supporting these leave requests,[9] arguing instead that Ohio Bell failed to disprove his alleged condition. (See R. 37, Pl.’s Resp. Br. at 21 27; Appellant’s Br. at 27-30; Appellant’s *355 Reply Br. at 10-14.) Without that evidence, no genuine issue remained for trial.
Filling this void for Tillman, our concurring colleague points to his medical certifications and argues that their presumptive validity satisfied Tillman’s burden. (See R. 82-6.) We disagree. Under these circumstances, where the employer promptly presents evidence impugning his leave requests the leave forecasts and surveillance evidence Tillman had a duty to come forward with some evidence showing his entitlement to the leave. See 29 U.S.C. § 2614(a)(1) (predicating FMLA leave and reinstatement upon the employee “tak[ing] leave ... for the intended purpose of the leave”). We may not presume from Tillman’s chronic condition and intermittent leave requests that he actually suffered from a serious condition on these specific days. This is especially so with cases concerned with countering, impugning evidence. Otherwise, the medical certification attesting to an intermittent condition could be used as a license to take unnecessary medical leave, eliminating the employee’s burden of showing entitlement. Cf. 29 U.S.C. § 2612(a)(1)(D) (requiring the leave-applicant to demonstrate a “serious health condition that ma[de] [him] unable to perform the functions of [his job]”); id. § 2612(b)(1) (allowing intermittent leave for a qualifying (a)(1)(D) health condition “when medically necessary”).
Our cases required Tillman to make a showing of entitlement to FMLA leave. Because he failed to do so, the district court did not err in granting Ohio Bell’s motion for summary judgment on Plaintiffs FMLA interference claim.
III. CONCLUSION
For all of the foregoing reasons, the judgment of the district court is AFFIRMED.

. In his reply brief, Tillman argues for the first time that it was logical for his FMLA days to routinely fall on the weekends because his work week typically lasted from Thursday until the following Monday. (Appellant’s Reply Br. at 5.) To support this proposition, *344 Tillman cites to a portion of Boyer's deposition where Boyer testified that Tillman preferred to have Mondays and Tuesdays off, as opposed to Tuesdays and Wednesdays. (R. 45, Boyer Dep. at 101.) Boyer, however also testified that employees do not have set schedules and that "[schedules] may change [every week] depending on the needs of the business." (Id. at 29.)

. Tillman argues that he could not have been seen working in his yard for two hours because "the surveillance tape itself is only forty six minutes and forty seven seconds.” (Appellant’s Br. at 8.) However, as Patrick McCreary testified, in his experience, private investigators typically do not run videotape for the entire time of the surveillance. (R. 32, Ex. D, McCreary Dep. at 114-16.) Furthermore, the written log from the surveillance reveals that Tillman was observed by the private investigators doing work in his garage and in his yard for two hours beginning at 11:01 a.m. (See R. 43, Investigative Services Report at 4.)

. McCreary further testified that Tillman acknowledged that he was not incapacitated every time he took FMLA leave, but sometimes he "just need[ed] a break.” (R. 43, McCreary Dep. at 96 & R. 44, Dep. Exs. 10 12.) Tillman denied telling McCreary that he sometimes just needed a break, but he did not deny making the statement about being too busy "driving people around” during the week. (See R. 50, Tillman Dep. 91-95.)

. Tillman, however, made no attempt to explain how, if he were under the influence of a narcotic, he would have nonetheless spent two hours driving his family around in his own car. Furthermore, Dr. Hoffman testified that she did not give Tillman an injection of Cortisone, nor did she ever prescribe him Oxycodone or Percocet. (R. 51, Hoffman Dep. at 82.)

. The Code of Business Conduct is utilized by the all of the separate companies that are part of the family of companies under the "AT & T” brand name. (R. 32, Ex. I, Redfern Aff. ¶ 5.)

. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

. Edgar tempered its denouncement of employer intent for interference claims by noting that "the FMLA is not a strict-liability statute,” 443 F.3d at 507, but, far from endorsing an employer-intent standard, the court acknowledged a prejudice requirement, explaining that "[e]mployees seeking relief under the entitlement theory must ... establish that the employer’s violation caused them harm,” id. at 508.

. Seeger, on the other hand, did involve allegations of disability fraud, but the court construed the plaintiff's claim as a retaliation claim because he "received all of the FMLA leave to which he was entitled.” 681 F.3d at 283. The court then applied the "honest belief” rule in affirming the district court’s grant of summary judgment to the employer. Id. at 285-87.

. Indeed, Tillman’s own testimony reflects that he does not recall why he asked for leave on March 15, 2009. (R. 50, Tillman Dep. at 131.)