RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0241p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────────

EDWARD RENDER,

                    *Plaintiff-Appellant*,

      *v*.

FCA US, LLC,

                    *Defendant-Appellee*.

No. 21-2851

─────────────────────

Appeal from the United States District Court for the Eastern District of Michigan at Port Huron.
No. 3:19-cv-12984—Robert H. Cleland, District Judge.

Argued:  June 1, 2022

Decided and Filed:  November 16, 2022

Before:  SUHRHEINRICH, MOORE, and CLAY, Circuit Judges.

─────────────────────

## COUNSEL

**ARGUED:**  Eric Stempien, STEMPIEN LAW, PLLC, Livonia, Michigan, for Appellant.  Terry Bonnette, NEMETH LAW, P.C., Detroit, Michigan, for Appellee.  **ON BRIEF:**  Eric Stempien, STEMPIEN LAW, PLLC, Livonia, Michigan, for Appellant.  Terry Bonnette, Nicholas Huguelet, NEMETH LAW, P.C., Detroit, Michigan, for Appellee.

      CLAY, J., announced the judgment, delivered the opinion of the court, in which SUHRHEINRICH and MOORE, JJ., joined, with respect to the retaliation claim, and delivered an opinion with respect to the interference claim.  MOORE, J. (pp. 23–30), wrote a separate opinion, in which SUHRHEINRICH, J., joined, concurring in part in J. Clay's majority opinion, and delivered the opinion of the court with respect to the interference claim.

---

**OPINION**

---

CLAY, Circuit Judge.   Plaintiff Edward Render ("Render") sued his former employer, FCA US, LLC ("FCA"), under the Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601, *et seq.*, alleging that FCA wrongfully denied him FMLA medical leave in violation of 29 U.S.C. § 2615(a)(1), and that FCA retaliated against him for requesting FMLA leave in violation of 29 U.S.C. § 2615(a)(2).   FCA moved for summary judgment on both claims, which the district court granted.  *Render v. FCA US LLC*, No. 19-12984, 2021 WL 3085401, at *9 (E.D. Mich. July 20, 2021).   For the reasons set forth below, we **REVERSE** the district court's order and **REMAND** for further proceedings.

## I.  BACKGROUND

### A.  Factual Background

Edward Render started working for FCA on January 3, 2013, as an assembly line worker at FCA's Trenton Engine Complex.   Eventually he moved into a more specialized position cutting cranks for engines.   FCA originally terminated his employment on September 14, 2015, for attendance infractions.   But Render filed a grievance through his union representative challenging his termination.   Ultimately, FCA conditionally reinstated him on April 10, 2017 and Render agreed to a one year probationary period.   Under the terms of his Conditional Reinstatement Letter, FCA could terminate him if he incurred two unexcused tardies or one unexcused absence during his probationary period.

On October 24, 2017, about six months after his reinstatement, Render applied for intermittent FMLA leave.   Sedgwick, FCA's third party leave administrator, replied on October 26, 2017, asking Render to provide medical documentation to support his request.   Render's doctor then submitted a medical certification form on November 9, 2017.   His doctor noted that he needed intermittent FMLA leave to manage his major recurrent depression and moderate/generalized anxiety disorder.   The medical certification form noted that Render was unable to perform "[a]ny/all duties related to [his] job during [a] flare-up of symptoms."   (Med.

Certification Form, R. 22-14, Page ID #190.) Render therefore requested up to three to four days of intermittent leave per month to manage his flare-ups. Sedgwick responded with a second letter on November 14, 2017, with the subject "Approval of Intermittent Employee Medical Leave." (Nov. 14 Sedgwick Letter, R. 22-15, Page ID #191.) The letter conditionally approved Render's request and noted that he could take up to four FMLA leave days per month. However, the letter also noted that Sedgwick would "review [his] eligibility as of [his] first day absent to determine if [he] met all eligibility requirements" at the time he used his leave. (*Id.*)

The letters from Sedgwick gave Render conflicting instructions about how to call in to use his intermittent FMLA leave days. The first letter from Sedgwick (asking Render for more medical documentation) gave the following instructions:

> As a reminder, you are required to report all absences and tardiness in accordance with FCA's mandatory Call-in Procedure. A failure to properly report any absence or tardy from work may result in disciplinary action, up to and including discharge. The Call-in number to report all absences is as follows: 1-800-810-[xxxx]. Absences and tardiness can be reported 24 hours, 7 days/week.
>
> In addition, you must contact the FCA Service Center at 1-888-322-[xxxx] to confirm your first day of absence. You will be advised of your eligibility determination within 5 business days (absent extenuating circumstances) of receiving notice of your first day of absence.

(Oct. 24 Sedgwick Letter, R. 22-13, Page ID #180–81.) But Sedgwick's second letter (approving Render's request for intermittent FMLA leave) gave different instructions:

> **Actions Required:**
>
> 1. **First Date Absent Notification:** Contact Sedgwick at the number listed below on the date of your first FMLA-related absence or tardy. . . .
>
> 3. **Intermittent Absence Time Reporting** - Since you have requested intermittent leave, you are required to report all absences and tardiness in accordance with FCA's mandatory Call-in Procedure. A failure to properly report any absence or tardy from work may result in disciplinary action, up to and including discharge. The Call-in number to report all absences is as follows: 1-800-810-[xxxx]. Absences and tardiness can be reported 24 hours, 7 days/week.

(Nov. 14 Sedgwick Letter, R. 22-15, Page ID #191–92.) The letter did not list any other phone number besides the 1-800 number in the "Actions Required" list. Seven paragraphs down from

these instructions, the letter included a closing note stating that, "If you have questions, require additional information, or experience a change in your circumstances, please contact the FCA Service Center at 1-888-322-[xxxx] . . . to speak with a Customer Service Representative." (*Id.* at Page ID #192.)

FCA's human resources representative, LaVonda Mitchell, gave contradictory statements at her deposition about how employees were required to report FMLA absences. Generally, employees must report an absence or tardy by calling FCA at the 1-800 number listed in Sedgwick's letters. At first, Mitchell said that there is not a separate call-in line for people who are using FMLA leave. Therefore, employees wishing to use FMLA leave simply needed to call the 1-800 number and report their absence. But Mitchell's summary of the proper procedures changed after she saw the letters that Sedgwick sent to Render. At that point in her deposition, she said that employees had to make two calls: one to FCA (the 1-800 number) and one to Sedgwick. Still, Mitchell did not know how employees were supposed to contact Sedgwick, and she did not know if the 1-888 number belonged to Sedgwick or to FCA.

Render believed that, to use his FMLA leave, he simply had to call the 1-800 number and report his absence. He "didn't realize there was a second number." (Render Dep., R. 22-2, Page ID #144.) He "thought what [FCA and Sedgwick] would do is just have [him] call one number, and they . . . would go from there." (*Id.*)

After his reinstatement in April 2017, Render was tardy three times and absent twice. He incurred an unexcused tardy on September 6, 2017—before he had applied for FMLA leave. After Sedgwick approved his intermittent leave request, he was absent on December 6 and 7, 2017. On December 6, Render called in absent. FCA produced a transcript of this call, which documented the following exchange with someone from "FCA Group Attendance:"

> THE OPERATOR: And are you calling in absent or tardy?
> MR. RENDER: Absent.
> THE OPERATOR: Absent due to what?
> MR. RENDER: I'm having a flare-up. I don't feel good at all. . . .
> THE OPERATOR: Absent due to what?
> MR. RENDER: Oh, I gotta go to the doctor. I don't feel good, flare – I'm having flare-ups.

THE OPERATOR:  So illness?
MR. RENDER:  Yes.

(Call Tr., R. 22-16, Page ID #194.)  The operator gave Render a confirmation number and told him to call back if he needed more time.  Although FCA had a record of this call, Sedgwick did not.

Render was again absent on December 7.  Although he said that he called the 1-800 number again to report his absence, FCA did not have any call records from that day.  However, Sedgwick's case notes indicated that Render did call in on December 7.  But there is no transcript of this call.  Render recalled telling the operator that he "was calling in for FMLA – to use an FMLA day."  (Render Dep., R. 22-2, Page ID #143.)

On December 8, 2017, Render called in tardy.  FCA produced a transcript of this call.  This time, he told the operator that he had "been sick the last few days."  (Call Tr., R. 22-16, Page ID #196.)  The operator asked whether the tardy was "personal" or "other," to which Render responded "Yeah personal – or other."  (*Id.*)  Like on December 6, Sedgwick's notes did not indicate that Render called in tardy on December 8.

Finally, Render called in tardy again on January 5, 2018.  When asked why, Render said he was "having a flare-up right now, and [he didn't] feel good at all."  (Call Tr., R. 22-16, Page ID #198–99.)  The operator then said, "I put other reasons, in the comments I put sick, . . . is that right?"  (*Id.* at Page ID #199.)  Render confirmed that was correct.  Each of these absences and tardies was marked by FCA as "MISU," meaning miscellaneous unexcused.

At his deposition, Render said that he used the word FMLA each time he called in.  He admits, however, that he never specifically mentioned that he was suffering from anxiety and depression related illnesses in any of his calls.  Render explained that he "was embarrassed" and he "didn't want to tell them what [he] was really going through."  (Render Dep., R. 22-2, Page ID #150.)

At this point, the record gets muddled with documents and testimony about what happened next.  Render's case file with Sedgwick includes several entries about his call-ins.  In the days after each absence, Sedgwick's notes indicated "Review Pending."  Render called

Sedgwick on December 8 and spoke with a Sedgwick employee, Joseph Moore. According to Moore's notes from this call, Render called in on December 7, but not on December 6 or 8. Whereas FCA's records indicated that Render called in on December 6 and 8, but not on December 7. The record does not include any depositions from Sedgwick employees to explain the case notes.

After returning to work on December 8, Render talked to one of his supervisors (identified only as "J.R.") about his absences. J.R. approached Render and said that he "noticed [Render] took FMLA." (Render Dep., R. 22-2, Page ID #146.) Based on that comment, Render assumed that everything was fine and his FMLA had been approved. But, a few days later, another one of Render's supervisors, LaToya Bradford, approached Render and told him that he had missed some days but that she did not see those absences in the system. Render showed Bradford the confirmation numbers he received when he called in, but Bradford said that she could not use those numbers. Bradford told Render to try calling again to see if they had any different confirmation numbers. Render did as Bradford instructed, called again, and received the same confirmation numbers. Render did not specify what phone number he called at this time "because [he] just had the number . . . on the phone that said FMLA." (*Id.* at Page ID #145.) Shortly thereafter, Bradford told Render that a human resources representative, Mitchell, wanted to speak with him. Mitchell said that FCA's systems showed that Render was off between December 6 and 8, but that FCA "d[idn't] have a record of it." (*Id.* at Page ID #144.) Mitchell did not recognize the confirmation numbers that Render provided, but she said that she would call Sedgwick and get back to Render about his absences. But Mitchell never followed up with Render.

By December 8, Mitchell knew that Render was claiming FMLA leave to cover his tardies and absences. Knowing this, Mitchell emailed a Sedgwick employee, Skylar Brum, on December 11. Mitchell asked whether Render was "FMLA approved or not?" (Sedgwick Case Notes, R. 24-13, Page ID #382.) Mitchell wrote:

> [Render] claims calling FMLA absent for 12-6-17 and 12-7-17. For 12-7-17, I don't even show a call-in. In addition, he claims calling FMLA tardy for 12-8-17. None of his calls show FMLA.
>
> Please let me know . . . .

(*Id.*)  Brum responded stating that:

> This claim is contingently approved with no absences coded as FMLA.  I do see absences in [his timesheet] for 12/06, 12/07 and 12/08/2017 with time lost however they are coded as MISU.

(*Id.* at Page ID #381.)  Mitchell asked Sedgwick for more details on December 20, saying that she "[j]ust needed to clarify as [Render] is up for termination due to these absences." (Sedgwick Case Notes, R. 22-18, Page ID #209.)  Sedgwick replied that "due to the employee absences not being coded under FMLA in [FCA's timesheet system] [Sedgwick] can't apply them to the claim."  (*Id.*)  Mitchell then reached out to FCA's attendance manager, Shawn Searcy, who looked at the call recordings from the days Render was absent.  Searcy told Mitchell that Render "did not say FMLA on the call."  (Mitchell Dep., R. 22-3, Page ID #166.)  Mitchell then contacted FCA's FMLA administrator, Anne Stebbins.  Mitchell gave Stebbins a summary of Render's case, and Stebbins "confirmed that there was no FMLA approved." (*Id.*)  Mitchell then consulted with her supervisor and concluded that Render should be terminated.

On January 11, 2018, Render was called into a meeting with Bradford, J.R., and Mitchell. Mitchell told Render that FCA was terminating him for violating his Conditional Reinstatement Letter.  The alleged violation was that Render had incurred three tardies and two absences. Specifically, Mitchell pointed to his tardies on September 6, 2017, December 8, 2017, and January 5, 2018, and his absences on December 6 and 7, 2017.  Mitchell gave him a Notice of Discharge and escorted him out of the building.

## B.  Procedural Background

Render filed his Complaint on October 10, 2019.  He brought two FMLA claims against FCA:  interference and retaliation.  *See* 29 U.S.C. § 2601, *et seq*.  After the close of discovery, FCA moved for summary judgment on both claims.  The district court granted FCA's motion and entered judgment in favor of FCA.  *Render*, 2021 WL 3085401, at *9.  Specifically, the district court found that Render had not made out a prima facie FMLA interference claim because he did not give sufficient notice to FCA before his absences and tardies in December 2017 and January 2018.  *Id.* at *7–*9.  It then found that, because Render had not properly requested FMLA leave, his retaliation claim likewise failed because he could not show that he

had engaged in protected activity and that FCA knew about that protected activity. *Id.* at *9. Render timely appealed.

## II. DISCUSSION

### A. Standard of Review

"We review the district court's grant of summary judgment *de novo*." *Kirilenko-Ison v. Bd. of Edu. of Danville Indep. Schs.*, 974 F.3d 652, 660 (6th Cir. 2020) (quoting *George v. Youngstown State Univ.*, 966 F.3d 446, 458 (6th Cir. 2020)). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute of a material fact is genuine so long as 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" *Kirilenko-Ison*, 974 F.3d at 660 (quoting *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 775 (6th Cir. 2016)).

"When evaluating a motion for summary judgment, this Court views the evidence in the light most favorable to the party opposing the motion." *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "This includes drawing 'all justifiable inferences' in the nonmoving party's favor." *Id.* (quoting *George*, 966 F.3d at 458). Moreover, "[i]n reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited." *Id.* (quoting *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009)).

### B. Analysis

The FMLA provides that "an eligible employee shall be entitled to a total of 12 work weeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of [his] position." 29 U.S.C. § 2612(a)(1)(D). If an employee is approved for a period of FMLA leave, then the employer must "restore[] . . . the employee to the position of employment held by the employee when the leave commenced" and the period of FMLA leave "shall not result in the loss of any employment benefit accrued prior to the date on which the leave commenced." *Id.* § 2614(a)(1)–(2).

"This court recognizes two distinct theories for recovery under the FMLA: (1) the 'entitlement' or 'interference' theory arising from 29 U.S.C. § 2615(a)(1); and (2) the 'retaliation' or 'discrimination' theory arising from 29 U.S.C. § 2615(a)(2)." *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir. 2004). Render brought claims under each theory.

    1. FMLA Interference Claim

Render first alleges that FCA interfered with his FMLA rights "by refusing to classify [his] absences appropriately as FMLA leave." (Pl. Br. at 9.) The FMLA prohibits employers from "interfer[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1). Examples of unlawful interference include "refusing to authorize FMLA leave" when the employee is eligible and counting FMLA leave under no-fault attendance policies. 29 C.F.R. § 825.220(b)–(c). "Under the FMLA interference theory, '[i]f an employer interferes with the FMLA-created right to medical leave . . . , a violation has occurred, regardless of the intent of the employer.'" *Marshall v. The Rawlings Co. LLC*, 854 F.3d 368, 384 (6th Cir. 2017) (quoting *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 282 (6th Cir. 2012)).

To make out a claim for FMLA interference, a plaintiff must show that "(1) he was an eligible employee, (2) [the] defendant was a covered employer, (3) he was entitled to leave under the FMLA, (4) he gave [the] defendant notice of his intent to take leave, and (5) the defendant denied him FMLA benefits or interfered with FMLA rights to which he was entitled." *Harris v. Metro Gov't of Nashville & Davidson Cnty.*, 594 F.3d 476, 482 (6th Cir. 2010). There is no dispute that Render was an eligible employee, that FCA was a covered employer, or that Render was entitled to FMLA leave because of his serious medical condition. The parties dispute only the fourth element, notice. If Render notified FCA that he intended to use his intermittent FMLA leave, then there would be no dispute that FCA denied this request. The notice requirement raises two issues in this case, the first focuses on whether Render complied with federal regulatory requirements for giving notice while the second asks whether he sufficiently followed FCA's internal notice requirements.

a. *Regulatory Requirements*

There are three provisions in the federal regulations that dictate how employees must notify their employers of their intent to take FMLA leave. First, 29 C.F.R. § 825.301(b) gives general instructions to all employees who want to designate leave as FMLA leave. In relevant part, it provides that:

> An employee giving notice of the need for FMLA leave does not need to expressly assert rights under the Act or even mention the FMLA to meet his or her obligation to provide notice, though the employee would need to state a qualifying reason for the needed leave and otherwise satisfy the notice requirements set forth in § 825.302 or § 825.303 depending on whether the need for leave is foreseeable or unforeseeable.

Employees must therefore comply with this broader provision *and* one of the two specific provisions that give detailed instructions to employees depending on whether the need for leave was foreseeable or unforeseeable. Before turning to the ultimate question—whether Render gave sufficient notice—we must address two preliminary issues.

The first issue is whether intermittent leave, like Render's, falls within the foreseeable leave provision (29 C.F.R. § 825.302) or the unforeseeable leave provision (29 C.F.R. § 825.303). The parties seemingly agree that intermittent FMLA leave is unforeseeable. Both therefore cite and rely on § 825.303 to provide the applicable notice requirement. The district court agreed and applied the unforeseeable leave regulation. *Render*, 2021 WL 3085401, at *5–*6. But the regulation on unforeseeable leaves never mentions intermittent leave. *See* 29 C.F.R. § 825.303. In contrast, the regulation governing *foreseeable* leaves includes specific procedures that apply to requests for intermittent leave. *Id.* § 825.302(a), (f). Thus, contrary to the concurrence filed herein, based on the clear language of these regulations, intermittent leave is treated as a type of foreseeable leave. *See id.* § 825.302. This may seem counterintuitive, since the point of intermittent leave is that an employee is asking for approved FMLA leave for unexpected and unpredictable absences. But, as this Court has explained, "[i]ntermittent leave is leave taken in separate blocks of time for a *single* qualifying reason." *Festerman v. Cnty. of Wayne*, 611 F. App'x 310, 314 (6th Cir. 2015) (quoting *Adams v. Honda of Am. Mfg., Inc.*, 111 F. App'x 353, 355 (6th Cir. 2004)). Foreseeability thus turns on whether the *qualifying*

*reason*, *i.e.*, the illness or medical condition, was foreseeable.  In intermittent leave cases, the qualifying reason is known in advance, even if it is unclear when the condition will flare up and require time off.  In this case, Render's depression and anxiety were known, and flare ups were foreseeable, even if Render could not predict precisely when he would need to take FMLA leave days.  Render was therefore required to comply with the foreseeable leave regulation, 29 C.F.R. § 825.302.

The next issue is whether Render had to give notice when he first applied for intermittent FMLA leave or on each day that he sought to use that leave.  The parties also agree on this question; they both focus on whether Render's call-ins on December 6, 7, and 8, 2017, and on January 5, 2018, satisfied the notice requirement.  Again, both parties miss the mark when reading these regulations.  The regulation for foreseeable leaves provides that:  "Whether FMLA leave is to be continuous or is to be taken intermittently . . . *notice need only be given one time*, but the employee shall *advise* the employer as soon as practicable *if dates of scheduled leave . . . were initially unknown*."  29 C.F.R. § 825.302(a) (emphasis added).  Therefore, Render did not need to give formal "notice" *each and every time* he called in to use his FMLA leave.  Rather, the regulation indicates that he needed to meet the notice requirement when he first sought approval for intermittent leave because this was when FCA first learned about his qualifying condition.  *See* 29 C.F.R. § 825.301(b) (explaining that the notice rules only require an employee to "state a qualifying reason for the needed leave").

When applying for intermittent FMLA leave in the fall of 2017, Render arguably had to comply with the heightened notice requirements for employees who have previously received FMLA leave:

> When an employee seeks leave for the first time for a FMLA-qualifying reason, the employee need not expressly assert rights under the FMLA or even mention the FMLA.  When an employee seeks leave due to a FMLA-qualifying reason, *for which the employer has previously provided FMLA-protected leave*, the employee must specifically reference the qualifying reason for leave or the need for FMLA leave.  In all cases, the employer should inquire further of the employee if it is necessary to have more information about whether FMLA leave is being sought by the employee, and obtain the necessary details of the leave to be taken.

29 C.F.R. § 825.302(c) (emphasis added). Render testified that, before his first termination and reinstatement, he had previously received FMLA leave from FCA. However, he did not say whether that prior leave was for the same qualifying condition (depression and anxiety). It is therefore unclear whether he would fall within the heightened notice requirements for a repeat applicant or whether he was applying for leave based on a different condition, which would subject him to a lower notice standard. *See* 29 C.F.R. § 825.302(c). Even under the more exacting standard, Render's intermittent leave request provided sufficient notice.

There is no dispute that Render contacted Sedgwick on October 24, 2017, and specifically referenced his need for FMLA leave. In response, Sedgwick asked Render for a medical certification form, which Render submitted on November 9, 2017. The medical certification form listed Render's qualifying reason as major recurrent depression and moderate/ generalized anxiety disorder. Therefore, his formal FMLA approval process satisfied the one-time notice requirement for intermittent leave. *See* 29 C.F.R. § 825.302(a). Render's subsequent calls on the days he wanted to use his leave did not need to "specifically reference either the qualifying reason for leave or the need for FMLA leave." *Id.* § 825.302(b). Render was under no obligation to cite the reason for his absence with such specificity because he had already given FCA formal notice of his qualifying condition.

Having previously given proper notice of his FMLA qualifying reason, Render merely had to advise FCA of his schedule change on days that he wanted to use his intermittent leave. *See* 29 C.F.R. § 825.302(a). On December 6—his first absence—he told the operator: "I'm having a flare-up. I don't feel good at all." (Call Tr., R. 22-16, Page ID #194.) Although there is no transcript of his call on December 7, Render testified that he told the operator that he "was calling in for FMLA – to use an FMLA day." (Render Dep., R. 22-2, Page ID #143.) Then on December 8, when he called in tardy, Render referenced his earlier calls saying that he had "been sick the last few days." (*Id.* at Page ID #196.) Finally, when he called in tardy on January 5, he said that he was "having a flare-up right now, and [he didn't] feel good at all." (Call Tr., R. 22-16, Page ID #198–99.) This was sufficient to satisfy the regulatory requirements to use FMLA leave because he had already given formal notice of his qualifying condition, and these calls sufficiently advised his employer of his anticipated absences.

Even if the notice requirement applied to his subsequent calls, Render argues that his use of the term "flare-up" when he called in on three of the four days was sufficient to notify FCA that he was trying to use his approved intermittent FMLA leave. While this Court has not interpreted what "specifically reference" requires, Render's reference to "flare-ups" would be sufficient because his FMLA medical documentation repeatedly referenced his "flare-ups" of depression and anxiety as the basis for his FMLA request. Referencing symptoms and language that is used in an employee's medical certification forms would be sufficient even if the notice requirements applied to each call-in. *See Evans v. Coop. Response Ctr., Inc.*, 996 F.3d 539, 549 (8th Cir. 2021). In *Evans*, 996 F.3d at 549, the Eighth Circuit applied the unforeseeable leave notice requirements in § 825.303(b) and concluded that an employee did not give sufficient notice when she called in to use her previously approved intermittent leave.[1] Even if intermittent leave fell within the unforeseeable regulation, which requires more than just "calling in sick," naming a symptom of the qualifying condition would be sufficient. *See id.* (finding that employee failed to give proper notice during call-ins because "[t]he only notice she provided . . . indicat[ed that] she lost her voice, had a slight fever, and had bodyaches, *which were not listed as symptoms of her reactive arthritis in her FMLA certification forms*" (emphasis added)); *see also Germanowski v. Harris*, 854 F.3d 68, 73–74 (1st Cir. 2017). When he called in absent, Render used identical language to that found in his FMLA certification forms. That was sufficient to meet his notice burden under any of the applicable regulations.

### b. *FCA Policy Requirements*

FCA next argues that Render's notice was nonetheless insufficient because it did not comport with FCA's internal policies. The FMLA leave regulations provide that "[a]n employer may require an employee to comply with the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances." 29 C.F.R.

---

[1]FCA asks this Court to do the same. It argues that the more onerous unforeseeable leave provisions found in 29 C.F.R. § 825.303 apply to Render. While mirroring most of the language from the foreseeable regulation, § 825.303 goes one step further and adds that "[c]alling in 'sick' without providing more information will not be considered sufficient notice to trigger an employer's obligations under the [FMLA]." 29 C.F.R. § 825.303(b). However, as previously discussed, Render's intermittent leave requests falls within the *foreseeable* leave regulations in § 825.302, and this additional language does not apply to him. And, as discussed below, even if the unforeseeable leave provision applied, Render has nonetheless satisfied the notice requirements found in that regulation.

§ 825.302(d). For example, employers may require an employee to contact a specific person to report their absences. *Id.*

On November 14, 2017, Sedgwick sent Render a letter conditionally approving his request for intermittent FMLA leave. In a section titled "Actions Required," the letter gave Render list of instructions, starting with "[c]ontact *Sedgwick* at the number listed below on the date of your first FMLA-related absence or tardy." (Nov. 14 Sedgwick Letter, R. 22-15, Page ID #191 (emphasis added).) That bullet point did not give a phone number. Under the third item in the list, the letter told Render to "report all absences and tardiness in accordance with *FCA's* mandatory Call-in Procedure" by calling the 1-800 number. (*Id.* at Page ID #192 (emphasis added).) The list ended there. No additional phone numbers were listed in the "Actions Required" section. Seven paragraphs later, in the final paragraph, the letter said: "If you have questions, require additional information, or experience a change in your circumstances, please contact the *FCA Service Center* at 1-888-[xxx]." (*Id.* (emphasis added).) FCA argues that Render failed to follow these instructions.[2] Specifically, it faults Render for failing to call *both* Sedgwick *and* FCA in advance of each tardy and absence.

In general, employers can establish call-in procedures, and they may deny FMLA leave if an employee fails to follow those instructions. *See* 29 C.F.R. § 825.302(d); *Alexander v. Kellogg USA, Inc.*, 674 F. App'x 496, 500 (6th Cir. 2017); *Perry v. Am. Red Cross Blood Servs.*, 651 F. App'x 317, 328 (6th Cir. 2016). Accordingly, FCA could adopt a policy requiring employees to call both Sedgwick and the FCA call-in line to report an FMLA absence. But an employee cannot be faulted for failing to comply with company policy if the policy was unclear or the employee lacked notice of the policy. *See Clements v. Prudential Protective Servs.*, 556 F. App'x 392, 396 (6th Cir. 2014) (finding employee met the notice element when employer's "lack

---

[2]Sedgwick had sent a different letter on October 26, 2017, asking Render to complete a medical certification form. That letter was *not* his FMLA approval letter, and it gave different call-in instructions. The October 26 letter told Render that he needed to "report all absences and tardiness in accordance with FCA's mandatory Call-in Procedure" by calling the 1-800 number. (Oct. 24 Sedgwick Letter, R. 22-13, Page ID #181.) The next paragraph stated, "[i]n addition, you must contact the *FCA Service Center* at 1-888-[xxx]." (*Id.* (emphasis added).) The letter did not mention anything about contacting Sedgwick directly. On appeal, FCA points only to the November 14 approval letter and argues that Render failed to comply with *those* instructions. Because it does not allege that Render failed to comply with the differing instructions in the October 26 letter, we will not consider the instructions in the earlier letter. We note, however, that FCA gave their employees conflicting instructions on how to use FMLA leave.

of communication led to the confusion" about employee's FMLA obligations and based on "the failure of [the] defendant to give its employees notice of how to proceed"); *Alexander*, 674 F. App'x at 496 (employer could deny FMLA leave after human resources reminded the employee of the call-in requirements, the employee still failed to comply, and the employee did not otherwise "allege[] ignorance of [the employer's] internal notice requirement"); *Perry*, 651 F. App'x at 320, 328 (employer could deny FMLA leave because employee "was on notice that she needed to call [the third party leave administrator], and it [was] undisputed that she did not do so").

In this case, Sedgwick's letter was so confusing that even Mitchell, who worked in FCA's human resources department, could not decipher what it was asking employees to do. Mitchell initially testified that all employees had to do was call FCA at the 1-800 number. Only after reading Sedgwick's letter to Render did she say that employees had to call *both* the FCA call-in line *and* Sedgwick. But when asked which phone number belonged to Sedgwick, Mitchell could not tell. Indeed, the letter said that *both* phone numbers belonged to *FCA*. (*See* Nov. 14 Sedgwick Letter, R. 22-15, Page ID #190–91 (identifying 1-800 number as FCA's Call-in number and the 1-888 number as the FCA Service Center).) The letter did not clearly identify a phone number for *Sedgwick* despite telling employees to "[c]ontact Sedgwick" at the "number listed below." (*Id.*) The only other phone number listed below was the "FCA Service Center" 1-888 number, and that number was buried at the end of the letter, wholly apart from the list of explicit instructions about the call-in procedure. These mangled instructions were so unclear that even Mitchell could not figure out what they meant.

Understandably, Render did not follow these confusing instructions to a tee. He believed that he simply had to call the 1-800 number and report his absence. He "didn't realize there was a second number." (Render Dep., R. 22-2, Page ID #144.) We cannot fault him for failing to call both FCA and Sedgwick when (1) the list of instructions only gave one phone number (the one he called), and (2) the letter did not clearly list a phone number for Sedgwick. Moreover, Render took other steps to ensure that he properly reported his FMLA days. In the days immediately following his absences, he told two different supervisors that his absences were FMLA days, and he followed up with Mitchell to ensure that his absences were properly coded.

Mitchell admitted that, by December 8, she knew that Render was claiming FMLA leave between December 6 and December 8. Based on these facts, a jury could find that Render gave proper notice of his intent to take FMLA leave. He has therefore made out a prima facie interference claim.

FCA suggests that the analysis should not stop there because the burden shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to Render's interference claim. Under *McDonnell Douglas*, once an employee makes out a prima facie interference claim, then the burden shifts to the employer to provide a legitimate nondiscriminatory reason for the alleged interference. *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 427 (6th Cir. 2014) (citing *Donald v. Sybra, Inc.*, 667 F.3d 757, 761–62 (6th Cir. 2012)). If the employer does so, then the burden shifts back to the employee to show that the proffered reason is pretextual. *Id.* (citing *Donald*, 667 F.3d at 761–62).

There remains some confusion over when *McDonnell Douglas* applies to interference claims. As a starting point, *McDonnell Douglas* applies only when the employee relies on circumstantial evidence to make his case. *Wallace v. Edward W. Sparrow Hosp. Ass'n*, 782 F. App'x 395, 401 (6th Cir. 2019) (citing *Donald*, 667 F.3d at 762); *Tillman v. Ohio Bell Tel. Co.*, 545 F. App'x 340, 348 (6th Cir. 2013) (per curiam) (citing *Seeger*, 681 F.3d at 283). For example, this Court has applied the burden shifting framework when an employee alleged that his employer interfered with his FMLA rights by terminating him because employers can terminate employees for many reasons—only some of which amount to FMLA interference. *See Demyanovich*, 747 F.3d at 431. But when an employee shows that his employer denied him FMLA benefits to which he was entitled, that is direct evidence of interference, and *McDonnell Douglas* does not apply. *See Travers v. Cellco P'ship*, 579 F. App'x 409, 414 (6th Cir. 2014) ("To recover on an interference claim, [the employee] must establish that the employer denied the employee FMLA benefits to which she was entitled." (citing *Wysong v. Dow Chem. Co.*, 503 F.3d 441, 447 (6th Cir. 2007))); *Festerman*, 611 F. App'x at 314 ("[U]nlawful interference occurs when an employer refuses to authorize leave for a qualified employee." (citing *George v. Russell Stover Candies, Inc.*, 106 F. App'x 946, 949–50 (6th Cir. 2004)); *Hurtt v. Int'l Servs.,*

*Inc.*, 627 F. App'x 414, 424 (6th Cir. 2015) (describing denial of FMLA leave as "literal[] interfere[nce]").

In this case, Render has shown that he was entitled to FMLA benefits, and a jury could find that FCA wrongfully denied him FMLA leave. Accordingly, the *McDonnell Douglas* burden shifting framework does not apply. Because Render has pointed to sufficient facts to make out a prima face interference claim, the district court erred in granting FCA's motion for summary judgment.

### 2. FMLA Retaliation Claim

Render next alleges that FCA "retaliated against [him] by discharging him for using FMLA leave." (Pl. Br. at 9.) Under the FMLA, employers are prohibited from "discharg[ing] or in any other manner discriminat[ing] against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). Unlike Render's interference claim, his retaliation claim is analyzed under the *McDonnell Douglas* burden shifting framework because he relies on circumstantial evidence of retaliation. *See Demyanovich*, 747 F.3d at 432; *Nieves v. Envoy Air, Inc.*, 760 F. App'x 421, 427 (6th Cir. 2019) (citing *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001)). Under this framework, if Render can establish a prima facie retaliation claim, then the burden shifts to FCA to show that it had "a legitimate, nondiscriminatory reason" for terminating him. *Nathan v. Great Lakes Water Auth.*, 992 F.3d 557, 573 (6th Cir. 2021) (quoting *Donald*, 667 F.3d at 761). If FCA does so, the burden shifts back to Render to show that FCA's given reason was pretextual. *Id.* (citing *Donald*, 667 F.3d at 761–62).

#### a. *Prima Facie Case*

To make out a prima facie case, Render must show that:

(1) [he] was engaged in an activity protected by the FMLA; (2) the employer knew that [he] was exercising [his] rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to [him]; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action.

*Redlin v. Grosse Pointe Public Sch. Sys.*, 921 F.3d 599, 616 (6th Cir. 2019) (quoting *Donald*, 667 F.3d at 761).

After finding that Render did not properly request leave, the district court dismissed his retaliation claim out of hand because Render did not engage in any protected activity and, therefore, FCA could not have known about any protected activity. *Render*, 2021 WL 3085401, at *9. The district court erred in coming to this conclusion. For the same reasons as discussed above, Render alleges sufficient facts to support a finding that he properly requested FMLA leave, and that FCA knew of this request. At the summary judgment stage, that satisfies the first two elements of his retaliation claim. *See Festerman*, 611 F. App'x at 319 (employee engages in protected activity and employer has knowledge when employee gives sufficient notice of his intent to take FMLA leave); *Basch v. Knoll, Inc.*, 619 F. App'x 457, 461 (6th Cir. 2015) (finding that protected activity begins when employee requests intermittent leave and provides certification of a qualifying medical reason).

FCA's arguments to the contrary are meritless. It suggests that it did not know that Render was asserting his rights under the FMLA because it "was aware only that Render *claimed* his absences were for FMLA-qualifying reasons, not that they were in fact for FMLA-qualifying reasons." (Def. Br. at 32 (emphasis in original).) However, FCA knew Render was engaging in protected activity when he first applied for intermittent leave in October 2017. *See Basch*, 619 F. App'x at 461. Even if FCA were right that the protected activity began when Render went to use his FMLA leave, FCA's argument still misses the mark. Employers are charged with knowing about FMLA protected activity as soon as an employee requests leave, even if it turns out the employee was not entitled to benefits. It is the *request* that is protected activity. *Demyanovich*, 747 F.3d at 433 ("By asking . . . for FMLA leave, [the employee] both engaged in protected activity and made his employer aware of it."). Even if FCA did not know that Render was using his intermittent FMLA leave at the time of his absences, the issue is whether it knew about his protected activity before it terminated him. In this case, even if Mitchell was unaware that Render asked to use his leave on December 6, she admitted that she knew he was claiming FMLA protection by December 8, over a month before she terminated him. The district court

therefore erred in concluding that Render's retaliation claim failed because he could not establish the first two elements of a prima facie case.

As to the third element, there is no dispute that Render's termination was an adverse employment action. The final prima facie element is causation. *Redlin*, 921 F.3d at 616 (quoting *Donald*, 667 F.3d at 761). In their discussion of causation, both parties focus on whether FCA properly terminated Render under the terms of his Conditional Reinstatement Letter. Although that issue is relevant when asking whether FCA had a legitimate nondiscriminatory reason for terminating Render, it is not germane to the prima facie causation element. The causation element often turns on the temporal proximity between the protected activity and the adverse employment action. *See Judge v. Landscape Forms, Inc.*, 592 F. App'x 403, 409 (6th Cir. 2014). Indeed, "the causal connection between the protected activity and the adverse employment action necessary for a prima facie case of retaliation can be established solely on the basis of close temporal proximity." *Id.* (citing *Seeger*, 681 F.3d at 283–84). The parties do not discuss temporal proximity in connection to their causation arguments but the record provides ample evidence showing that Render can satisfy this requirement. We have "found sufficient evidence of a causal connection where the time between when . . . the employee requested leave and the employee's termination was two to three months." *Id.* (citing *Clark v. Walgreen Co.*, 424 F. App'x 467, 473 (6th Cir. 2011)). Whether we measure this time from the moment Render first sought intermittent FMLA leave on October 24, 2017, or from the date he first sought to use that leave on December 6, 2017, both dates fall within three months of his termination on January 11, 2018. Thus, Render has provided sufficient evidence to establish his prima facie case at this stage.

b. *Nondiscriminatory Reason*

Because Render has established a prima facie retaliation claim, the burden shifts to FCA to articulate a legitimate nondiscriminatory reason for the adverse employment action. *See Nathan*, 992 F.3d at 573 (quoting *Donald*, 667 F.3d at 761). FCA argues that it terminated Render for "excessive, unexcused absences and tardies in violation of his Conditional Reinstatement Letter." (Def. Br. at 32–33.) Terminating an employee for unexcused absences

that violated company policy is a sufficient nondiscriminatory reason to meet FCA's burden. *See Wallace*, 782 F. App'x at 403.

c. *Pretext*

The burden then shifts back to Render to show that FCA's given reason was pretextual. *See Nathan*, 992 F.3d at 573 (quoting *Donald*, 667 F.3d at 761). "[A] plaintiff may meet his or her burden to 'demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct.'" *Judge*, 592 F. App'x at 410 (quoting *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)).

FCA argues that Render cannot show pretext because FCA investigated Render's absences and tardies before it terminated him, and it concluded that Render had not properly requested FMLA leave for those days. It points to several actions that Mitchell took before she ultimately terminated Render. First, on December 8, after Mitchell learned that Render thought his absences were FMLA, Mitchell emailed Sedgwick to ask whether he had approved FMLA leave. Sedgwick told Mitchell that Render's claim was "contingently approved with no absences coded as FMLA," and noted that his absences and tardies on December 6, 7, and 8 were coded as "MISU" meaning miscellaneous unexcused. (Sedgwick Case Notes, R. 24-13, Page ID #381; Mitchell Dep., R. 22-3, Page ID #164.) Mitchell followed up on December 18, and Sedgwick again advised her that "[t]he claim is still contingently approved with no absences coded as FMLA." (Sedgwick Case Notes, R. 24-13, Page ID #378–79.) Second, Mitchell called FCA's attendance manager, Shawn Searcy, who looked at the call recordings from the days Render was absent. FCA says that Searcy told Mitchell that "Render had not requested FMLA leave when he called the absences in." (Def. Br. at 33.) But all Searcy told Mitchell was that Render "did not say FMLA on the call." (*Id.*) Third, Mitchell contacted FCA's FMLA administrator, Anne Stebbins. Mitchell gave Stebbins a summary of Render's case, and Stebbins "confirmed that there was no FMLA approved." (Mitchell Dep., R. 22-3, Page ID #166.) Finally, Mitchell consulted with her supervisor before jointly deciding whether termination was the proper action given Render's absences and tardies.

In response, Render argues that FCA's proffered reason—unexcused absences—had no basis in fact because his absences were *incorrectly* coded as unexcused. The record indicates that the operator who answered Render's call-ins was responsible for initially coding the request. As discussed above, Render said enough on those calls to allow a jury to find that the operator erred in marking his absences and tardies as "MISU." *See supra* Part A. Sedgwick then used the information *from the operator* to determine that Render was not seeking FMLA leave to cover his absences. When Render called Sedgwick to sort out the error, Sedgwick told him that "he need[ed] to talk to someone in HR to have [the absences and tardies] recoded as FMLA as [Sedgwick] only go[es] by what comes over from the plant." (Sedgwick Case Notes, R. 24-13, Page ID #375) So, Render went to Mitchell. Mitchell admitted that she had the power to manually recode the absences as FMLA. But she never did. Viewing the facts in the light most favorable to Render, Mitchell failed to catch the many errors that were made in the process of marking Render's absences as "MISU." Even though she had the power to fix those errors, Mitchell did not recode Render's absences. Instead, she terminated him. A jury could find that *Mitchell's errors* were the only thing giving her a reason to terminate Render, given that his absences would have otherwise been excused. Indeed, the record shows that Mitchell terminated Render even though she *knew* that he was trying to use his FMLA days and that he was already conditionally *approved* for intermittent FMLA leave. Still, she refused to recode the absences as FMLA. A jury could thus find that the proffered reason had no basis in fact.

As a last resort, FCA points to the "honest belief" rule to rebut Render's pretext arguments. Where, as here, an employee provides evidence that the proffered reason had no basis in fact, the employer may still be able to defeat a retaliation claim under the "honest belief" rule. *See Tillman*, 545 F. App'x at 349. "'[A]s long as an employer has an honest belief in its proffered non-discriminatory reason,' the employee cannot establish pretext simply because the reason is ultimately shown to be incorrect." *Id.* (quoting *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001)). At this point, Render has provided ample evidence indicating that FCA wrongfully designated his absences as unexcused when they should have been coded as FMLA. And Mitchell admitted that she terminated Render even knowing that he qualified for FMLA leave and that he was trying to use his approved leave to cover his absences and tardies in December and January. Render thus raised sufficient facts

showing that FCA's nondiscriminatory reason was pretextual.  Accordingly, the district court erred in granting FCA's motion for summary judgment on this claim.

### III. CONCLUSION

For these reasons, we **REVERSE** the district court's order granting FCA's motion for summary judgment and **REMAND** for further proceedings.

―――――――――――――――――――

**OPINION/CONCURRENCE**

―――――――――――――――――――

KAREN NELSON MOORE, Circuit Judge, concurring.  Judge Clay's thoughtful lead opinion captures our majority position as to Render's retaliation claim, but not as to his interference claim.  Judge Suhrheinrich and I write separately to explain our majority position on Render's interference claim.  Although Judge Suhrheinrich and I agree with the lead opinion that the district court erred in granting FCA's motion for summary judgment on Render's interference claim, we take a different path to reach that conclusion.  In our view, the leave at issue should be analyzed under the regulation governing employee notice for *unforeseeable* leave, 29 C.F.R. § 825.303, not the regulation governing employee notice for foreseeable leave, 29 C.F.R. § 825.302.  This opinion details that view and sets forth the majority position with respect to Render's interference claim.

## I.  BACKGROUND

Like many Americans, Render has struggled with mental-health issues.  Aware that these issues might affect his attendance record at work, Render notified his employer, FCA US, LLC (FCA), of the matter.  Render provided FCA with a medical certification attesting that he suffered from "major recurrent" depression and "moderate/generalized anxiety disorder"; that symptoms of these conditions could "flare up"; that these flare ups may occur between three-to-four times a month, though he did not know when; and that he would be unable to work if they did.  R. 22-14 (Med. Certification at 2) (Page ID #190).  When these symptoms arose in late 2017 and early 2018, Render called in to take leave under the Family and Medical Leave Act (FMLA or Act), 29 U.S.C. §§ 2601–54, stating that he was taking leave under the Act, that he would be absent or tardy because he was having a "flare up," and that the leave was a continuation of the leave he had taken in recent days.  R. 22-16 (Telephonic Tr. at 2:13–25, 4:10–19, 6:25–7:5) (Page ID #194, 196, 198–99); R. 22-2 (Render Dep. at 88:10–21) (Page ID #143).  We address in this opinion whether Render provided sufficient notice of his intent to take leave under the FMLA.

## II.  ANALYSIS

"The FMLA entitles qualifying employees to up to twelve weeks of unpaid leave each year if, among other things, an employee has a 'serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005) (quoting 29 U.S.C. § 2612(a)(1)(D)).  For employees with a serious health condition, the FMLA provides three options for leave:  "(1) one block of leave of twelve weeks or fewer; (2) intermittent leave, which means 'leave taken in separate periods of time due to a single illness or injury . . . and may include leave of periods from an hour or more to several weeks'; and (3) reduced leave schedule, a plan under which the employer reduces the employee's normal work hours, usually to a part-time basis." *Hoffman v. Pro. Med Team*, 394 F.3d 414, 418 (6th Cir. 2005) (citing, *inter alia*, 29 U.S.C. §§ 2612(a)(1), 2611(9)); *see also* 29 C.F.R. §§ 825.102, 825.202, 825.203.  The parties do not dispute that Render has a serious medical condition and that his leave was intermittent.

If an employer like FCA either interferes with, or retaliates against, an employee like Render who is taking one of these forms of leave, then that employee may have a valid claim under the FMLA against the employer.  *See Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012) (listing elements for prima facie interference and retaliation claims).  That is, there may be a valid interference or retaliation claim if the employee properly alerted the employer to the need for leave.  *See id.*; *see also Munoz v. Selig Enterprises, Inc.*, 981 F.3d 1265, 1276–77 (11th Cir. 2020).  Gauging the adequacy of the notice that Render provided is at the center of this case.

## A.  Regulatory Requirements

### 1.  Applicable Law

We begin by considering whether Render complied with the notice provisions of the pertinent regulations promulgated by the United States Department of Labor, the agency responsible for administering the FMLA.  *See* 29 U.S.C. § 2654.  At the outset, these regulations create a fork in the road.  Before determining what qualifies as adequate notice, employees seeking to take FMLA leave must determine "whether *the need for leave* is foreseeable or unforeseeable."  29 C.F.R. § 825.301(b) (emphasis added).  Section 825.301 does not provide

further guidance on how to determine the foreseeability of "the need for leave." Instead, it directs employees and employers (and courts) to consult two other regulations for an answer: § 825.302 and § 825.303.

Section 825.302 details the notice requirements that an employee must follow when the requested FMLA leave is "foreseeable." What counts as "foreseeable" has been subject to disagreement because this term, like "unforeseeable," is not defined in either the FMLA or its implementing regulations. *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1196 (11th Cir. 2015). That said, although "[c]ourts usually speak in terms of whether the need for leave itself was foreseeable," the FMLA "is a bit more specific" regarding the word's meaning. *Id.* (collecting cases). It premises foreseeability on one of four events: (1) an "expected birth," (2) an expected placement for adoption or foster care, (3) a planned medical treatment of the employee or certain family members, or (4) a planned medical treatment of a covered servicemember. 29 U.S.C. § 2612(e); *see also White*, 789 F.3d at 1196. Those scenarios are reflected in 29 C.F.R. § 825.302(a), which requires that if an employee's proposed leave arises from one of those four situations, then the employee must provide thirty days notice unless doing so "is not practicable."

In any event, the notice requirements for foreseeable leave aim to provide clarity about when the leave will be taken in several ways. The notice must detail "the anticipated timing and duration of the leave." 29 C.F.R. § 825.302(c). "Whether FMLA leave is to be continuous or is to be taken intermittently or on a reduced schedule basis, notice need only be given one time, but the employee shall advise the employer as soon as practicable if dates of scheduled leave change or are extended, or were initially unknown." *Id.* § 825.302(a). Finally, in the cases of intermittent leave or a reduced leave schedule, the employer and employee must try "to work out a schedule for such leave that meets the employee's needs without unduly disrupting the employer's operations, subject to the approval of the health care provider." *Id.* § 825.302(f).

"When the *approximate timing* of the need for leave is not foreseeable," on the other hand, an employee must turn to the next section in the regulations. *Id.* § 825.303(a) (emphasis added). Unlike its nearby counterpart, 29 C.F.R. § 825.303 does not provide an exhaustive list of conditions that trigger its notice provisions. Instead, the sole example to be found here is that of

an employee whose child is afflicted with asthma and has a severe attack, causing the employee to miss work to take the child to the emergency room. *Id.* This example is instructive: whereas § 825.302 (foreseeable leave) emphasizes the ability to schedule the leave and limits its requirements to scenarios in which that is possible, § 825.303 (unforeseeable leave) stresses the opposite—that the "approximate timing" for the leave was unknowable in advance. *Id.*

Sections 825.302 and 825.303 of the regulations thus create two poles of predictability. To illustrate how these work in practice, consider two hypothetical employees. Both employees need to request FMLA leave. The first employee must take time off every Monday, Wednesday, and Friday to receive dialysis. The second employee, too, must periodically take time off. But this employee must do so because they suffer from chronic migraines. The timing of these episodes is difficult to predict, though they unfortunately can occur a couple of times a month.

What determines where each employee falls on the foreseeability spectrum? The intermittent nature of leave does not dictate its predictability. Such leave could fall on either end. *Compare Acker v. General Motors, L.L.C.*, 853 F.3d 784, 786, 789 (5th Cir. 2017) (employee who was approved for intermittent leave because of acute iron-deficiency anemia had to comply with § 825.303), *and Norton v. LTCH*, 620 F. App'x 408, 409, 410–11 (6th Cir. 2015) (employee who was approved for intermittent leave because of vestibular migraines had to comply with § 825.303), *and Millea v. Metro-N. R.R. Co.*, 658 F.3d 154, 159, 161–62 (2d Cir. 2011) (employee who was approved for intermittent leave based on suffering from "severe post-traumatic stress disorder" that resulted in "unpredictable panic attacks and exhaustion" had to comply with § 825.303), *with* 29 C.F.R. § 825.302 (discussing intermittent leave when foreseeable due to an enumerated scenario).

Nor does the fact that a medical condition was known before the need for leave arose necessarily answer the question. As some of the cases cited above show, an employee can inform their employer of a medical condition and still need to follow § 825.303's requirements for unforeseeable leave when symptoms of that condition arise. *See Acker*, 853 F.3d at 786, 789; *Norton*, 620 F. App'x at 409, 410–11; *Millea*, 658 F.3d at 159, 161–62; *see also White*, 789 F.3d at 1196–97.

Rather, the key factor for determining foreseeability is whether the *timing* of the leave was anticipated. That is why in both 29 U.S.C. § 2612(e) and 29 C.F.R. § 825.302 the focus is on events that would lead to planned absences like a scheduled surgery, and why in 29 C.F.R. § 825.303 the focus is on events that are difficult to plan like an asthma attack. This is also why other provisions of the regulations identify the ability to pinpoint—or at least approximate—a date as the touchstone of foreseeability. For example, in discussing the consequences of inadequate notice, one section of the regulations notes how "knowledge that an employee would receive a telephone call about the availability of a child for adoption at some unknown point in the future would not be sufficient to establish the leave was clearly foreseeable 30 days in advance." 29 C.F.R. § 825.304(b). In short, the difference between foreseeable and unforeseeable leave is the difference between knowing and not knowing *when* leave will be needed *before* the time comes to request it.

This principle resolves our hypotheticals. On the one hand, the dialysis patient's request for leave is a paradigmatic instance of foreseeable intermittent leave. The times when this employee will be absent are known in advance and the employee and employer could establish a schedule. On the other hand, the chronic-migraine sufferer's request for leave is an example of unforeseeable intermittent leave. The employee's potential need for leave was anticipated, but the timing of this leave was unknown because the flare ups of symptoms do not adhere to a schedule.

That principle also resolves the present issue. Employees with known health conditions that result in "a sudden, acute flareup" of symptoms must follow 29 C.F.R. § 825.303, not 29 C.F.R. § 825.302, when requesting leave. *Munoz*, 981 F.3d at 1276. Render was one such employee. Like the employee with chronic migraines, Render's mental-health issues meant that he was likely to miss at least several days of work a month. R. 22-14 (Med. Certification at 2) (Page ID #190). When these absences would occur, however, was unpredictable. That makes the leave unforeseeable and makes § 825.303 the applicable notice regulation.

## 2. Contents of the Notice

That leaves the issue of whether Render provided FCA with adequate notice under § 825.303. Here, a reasonable jury could find that Render gave sufficient notice of his need to take FMLA leave on December 6, 7, and 8, 2017, and on January 5, 2018. *See Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Schools*, 974 F.3d 652, 660 (6th Cir. 2020).

Revised by the Department of Labor in 2009, this section of the regulations requires that an employee provide different levels of notice depending on the employee's history of taking FMLA leave with the employer. Section 825.303(b) explains that:

> When an employee seeks leave for the first time for a FMLA-qualifying reason, the employee need not expressly assert rights under the FMLA or even mention the FMLA. When an employee seeks leave due to a qualifying reason, for which the employer has previously provided the employee FMLA-protected leave, the employee must specifically reference either the qualifying reason for leave or the need for FMLA leave.

29 C.F.R. § 825.303(b). Either way, an employee "[c]alling in 'sick' without providing more information will not be considered sufficient notice to trigger an employer's obligations under the Act," though an "employer will be expected to obtain any additional required information through informal means." *Id*. Once before a court, the adequacy of an employee's notice is "an intensely factual determination." *Donald*, 667 F.3d at 761.

With less context, some of Render's four call-ins could be viewed as providing insufficient notice. Although Render referenced the FMLA during his December 7, 2017 call-in,[1] he did not do so during his call-ins on December 6, 2017 and January 5, 2018, opting instead to say that he was suffering from "flare ups." R. 22-2 (Render Dep. at 88:10–21) (Page ID #143); R. 22-16 (Telephonic Tr. at 2:13–25, 6:25–7:5) (Page ID #194, 198–99). As the district court noted, a "flare up" just means "a sudden appearance or worsening of the symptoms of a disease or condition." *Render v. FCA US LLC*, No. 19-12984, 2021 WL 3085401, at *7 (E.D. Mich. July 20, 2021) (quoting Webster's Third International Dictionary, Unabridged (2020)). The term does not by itself indicate what these symptoms or the underlying disease or condition

---

[1]Sedgwick's records could at this stage be reasonably read as indicating that Render called in on December 7, 2017 despite there being no transcript of the call. *See* R. 24-13 (Sedgwick Case Note at 9) (Page ID #382).

are. Standing alone, an employee reporting that they were having a "flare up" could be the equivalent of calling in "sick," which 29 C.F.R. § 825.303(b) explicitly provides "will not be considered sufficient notice to trigger an employer's obligations under the Act." The same is true of Render's call from December 8, 2017, during which he merely reported having been "sick the last few days," referencing his calls from December 6 and 7. R. 22-16 (Telephonic Tr. 4:10–19) (Page ID #196).

But there is more to this story. Nothing in 29 C.F.R. § 825.303(b) commands that we overlook pertinent background. On the contrary, other circuits have indicated that courts should consider the employer's knowledge when assessing the adequacy of notice for unforeseeable leave, even under the revised regulations. *See Munoz*, 981 F.3d at 1270, 1276–77 (holding emails referencing symptoms coupled with employer's knowledge of underlying health conditions constitute sufficient notice under § 825.303(b)); *Germanowski v. Harris*, 854 F.3d 68, 73–74 (1st Cir. 2017) (placing email that called in "sick" in broader context to conclude that the message arguably provided adequate notice under § 825.303(b)); *cf. Evans v. Coop. Response Ctr., Inc.*, 996 F.3d 539, 545, 549 (8th Cir. 2021) (holding that employee failed to provide adequate notice under § 825.303(b) when she did not mention symptoms listed in her FMLA certification forms). Given that employers are under a duty to inquire further about the nature of the leave requested, a previously submitted medical certification listing symptoms is relevant to evaluating what can be reasonably gleaned from an employee's call-in. *See* 29 C.F.R. §§ 825.301(a), 825.303(b).

Before making any of his calls, Render provided FCA with such a certificate. *See* R. 22-14 (Med. Certification) (Page ID #189–90). This document informed the company that Render would be unable to work when the symptoms of his depression and anxiety were acute. *Id.* at 2 (Page ID #190). More importantly, the certificate alerted FCA that Render would be unable to work when these symptoms "flare[d] up." *Id.* It also noted that these flare ups could occur three-to-four times a month. *Id.*

Therefore, when Render called in on three consecutive days in December 2017 specifically referencing either his symptoms flaring up, or the FMLA, or, by the last day, his previous two days out and his subsequent need to be late to work, it would be reasonable to

conclude that he put FCA on notice that he was referring to his FMLA-qualifying condition. R. 22-16 (Telephonic Tr. at 2:13–25, 4:9–19) (Page ID #194, 196); R. 22-2 (Render Dep. at 88:10–21) (Page ID #143). The same is true for the January 5, 2018 call, during which Render also identified a flare up of his symptoms as the reason for his tardiness. R. 22-16 (Telephonic Tr. at 7:4–5) (Page ID #199). At the very least, FCA knew that Render had been requesting FMLA leave during the December call-ins by the day of the last leave request because he reinformed the company that he had been doing so. *See, e.g.*, R. 24-13 (Sedgwick Case Note at 9) (Page ID #382); R. 22-3 (Mitchell Dep. at 39:1–5) (Page ID #163). On this record, we hold that a reasonable jury could conclude that Render provided adequate notice of his need for unforeseeable FMLA leave each time that he called in.

### B. FCA Policy Requirements

We conclude by addressing whether Render has come forward with sufficient evidence of his compliance with FCA's internal leave policies. As above, we hold that the regulation governing unforeseeable leave provides the applicable law. *See* 29 C.F.R. § 825.303. Although the lead opinion addresses the issue under the regulation applicable to foreseeable leave, both paths lead to the same result. Whether the leave is foreseeable or unforeseeable, an employee must comply (absent unusual circumstances) with his or her employer's "usual and customary" leave policies. *See* 29 C.F.R. §§ 825.302(d), 825.303(c). For the reasons stated in the lead opinion, a reasonable jury could find that Render provided sufficient notice of his intent to take FMLA leave under FCA's internal leave policies. Accordingly, Render established a prima facie claim of interference under the FMLA, and the district court erred in granting FCA's motion for summary judgment.

### III. CONCLUSION

We hold that Render was required to comply with the requirements for unforeseeable leave under 29 C.F.R. § 825.303. Under the circumstances, a reasonable jury could find that Render provided sufficient notice under § 825.303 to trigger FCA's obligations under the FMLA. We therefore reverse the district court's judgment and remand for further proceedings based on these grounds and those otherwise provided in the lead opinion.